Ebnest L. Signobellx, J.
Defendant, Kenneth J. Cruciani, makes this application to the court seeking the following relief:
(1) To inspect the Grand Jury minutes upon which this indictment is based and to dismiss counts two and three of the indictments;
(2) To suppress any alleged admissions, either oral or written, on the ground that said admissions were obtained from the defendant in violation of his constitutional rights;
*529 (3) To suppress any physical evidence which was obtained from the defendant as a result of the alleged admissions.
The defendant has been indicted for the following crimes:
COUNT ONE
Injection of a narcotic drug
The defendant, in the County of Suffolk, on or about September 9, 1971, knowingly and unlawfully possessed a narcotic drug, to wit, heroin, and intentionally injected by means of a hypodermic syringe or hypodermic needle all or a portion of said drug into the body of one Margaret Colleen Heuer with the latter’s consent.
COUNT TWO
Manslaughter in the second degree
The defendant, in the County of Suffolk, on or about September 9,1971, recklessly caused the death of one Margaret Colleen Heuer by injecting her with a hypodermic syringe or hypodermic needle containing a narcotic drug, to wit, heroin, from which she died on September 10, 1971.
COUNT THEBE
Criminally negligent homicide
The defendant, in the County of Suffolk, on or about September 9, 1971, with criminal negligence, caused the death of one Margaret Colleen Heuer by injecting her with a hypodermic syringe or hypodermic needle containing a narcotic drug, to wit, heroin, from which she died on September 10,1971.
The following are some of the pertinent facts derived from the Grand Jury testimony :
The defendant, Kenneth J. Cruciani, is 22 years of age, an admitted heroin user and, in all probability, an addict. At the time of this occurrence, he was living in an apartment over a bar located on Jericho Turnpike, Smithtown, New York. On September 9, 1971, at approximately 8:00 p.m., the victim, Margaret Colleen Heuer, a young girl of 19 years of age, visited him at his apartment. The defendant observed that she was under the influence of drugs. She was high on “ downs ”, and, as a matter of fact, “ she could not walk or talk straight ”. They talked for a while and then she fell asleep on the bed. He then left the room and went out at about 9:00 to 9:30 p.m. to purchase some pizza in a restaurant.
When he returned, he found the young girl trying to inject heroin into her arm with a hypodermic syringe and needle. She *530 was apparently having difficulty, and he then proceeded to assist her, and actually injected the heroin into her arm. They then had some food and she went back to sleep. She was lying on the bed in a semi-conscious condition. Shortly thereafter she started to regurgitate, and he placed her on the floor. He watched television for a while and then went to sleep.
Shortly thereafter his roommate requested of the defendant that he accompany the roommate’s girl friend home. He did so and returned between 2:00 and 3:00 a.m. and found Margaret still on the floor sleeping. Defendant then went to bed and shortly thereafter he heard Margaret make a “ gurgling noise ”. He then applied mouth to mouth resuscitation and was unable to revive her.
The defendant then went to his mother’s house in Commack to seek help from his older brother. He and his older brother went back to his apartment and, at that point, the brother advised defendant to call the police and procure an ambulance.
Defendant then removed the works (hypodermic needle, syringe, etc.) from his room and returned to his mother’s house to call the police. Defendant and his mother went back to his apartment and found the police waiting for them. He then proceeded to lead the police to the room where Margaret was located.
Officer Goode, one of the policemen who responded, arrived at the defendant’s apartment at approximately 4:30 a.m., and, after feeling Margaret’s pulse, concluded that she was dead. As a matter of fact, the girl was officially pronounced dead by a physician at 5:30 a.m. on September 10, 1971.
The deputy medical examiner who performed the autopsy stated the cause of death to be acute and chronic intravenous narcotism. It was his opinion that heroin had been injected into the body of the deceased intravenously and a short period of time before death.
Dr. Dal Cortivo, a toxicologist, was provided with tissues from the deceased’s body which were taken from her vital organs. Upon analysis, he found that they contained certain quantities of morphine, quinine and secobarbital.
Quinine is a clandestine way to dilute heroin. Secobarbital is a popular sleeping capsule. Heroin, of course, is a simple derivative of morphine, and once it is injected in the body, it is rapidly converted by metabolic process to morphine. As a matter of fact, in a matter of 60 to 90 minutes, following the injection of heroin, one is unable to establish the presence of heroin in the body, and one can only detect morphine.
*531 Dr. Dal Cortivo observed that the amount of barbiturate which he found in the deceased’s body was infinitesimal, and he concluded that it was the heroin injection that killed the girl. He arrived at this conclusion predicated on his analysis of the tissues and the levels of morphine which he found, as well as the normal rate of dissipation. In his judgment, this girl was administered an overdose of heroin.
The defendant, in branch 1 of his motion, is requesting that the court dismiss the counts of the indictment relating to reckless manslaughter and criminally negligent homicide. He maintains that the chronology of events leading up to the death of the victim does not constitute the indictable offense of homicide, and assuming arguendo that he committed the acts claimed by the People and that Margaret Colleen Heuer died as a result of the heroin injection he administered that this does not warrant an indictment for the crimes of reckless manslaughter and criminally .negligent homicide as defined by the applicable penal statutes. Lin other words, the question before the court is whether, under all of the facts and circumstances of this case, the defendant’s act in injecting the heroin into the arm of the victim constitutes a substantial and unjustifiable risk of death, and was this risk of such a nature that it constituted a gross deviation from the standard of conduct that a reasonable person would observe in that situation,^)
Section 125.15 of the Penal Law (manslaughter in the second degree) provides: “A person is guilty of manslaughter in the second degree when: 1. He recklessly causes the death of another person ”.
Subdivision 3 of section 15.05 of the Penal Law defines ‘1 recklessly ” as follows: “ A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation ”.
Section 125.10 of the Penal Law (criminally negligent homicide) provides: “A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person ”.
Subdivision 4 of section 15.05 of the Penal Law defines “ criminal negligence ” as follows: “ A person acts with criminal negligence with respect to a result or to a circumstance *532 described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation ”.
To the court’s knowledge, this is a case of first impression in the State of New York although there are two recent decisions dealing with similar circumstances. Defendant relies heavily on the recent Appellate Division decision of People v. Pinckney (38 A D 2d 217), in which the Appellate .Division affirmed a lower court order dismissing two counts of an indictment charging the defendant with manslaughter and criminally negligent homicide. The facts in that case indicated that the defendant had sold heroin to the deceased, and that with instruments furnished by the defendant, the deceased injected heroin into his own body with the result that he died. The Appellate Division held that the County Court properly dismissed the indictment charging criminally negligent homicide and manslaughter since in its opinion £ £ the provisions of the Penal Law of New York do not make the act of selling a dangerous drug, which, when injected with instruments furnished by the seller of the drug, causes the death of the user, a homicide ”. (People v. Pinckney, supra, p. 220.)
Mr. Justice Shapiro, in his concurring opinion moreover stated that £ ‘ while there has recently been a substantial increase in deaths from narcotics, the proportion of such deaths to the number of times narcotics are currently being used by addicts and for legal medical treatment is not nearly great enough to justify an assumption by a person facilitating the injection of a narcotic drug by a user that the latter is thereby running a substantial and unjustifiable risk that death will result from that injection”. (People v. Pinckney, supra, pp. 223-224.)
The court has carefully read and considered the opinion of the Appellate Division in People v. Pinckney (38 A D 2d 217, supra), and is mindful of its obligation to follow precedent and to apply the law as interpreted by courts of higher authority. However, each case must be decided on its own facts and this court must address itself to the law and facts of this particular case. There are significant differences between the facts in this case and thpse in People v. Pinckney (supra). In this case, the act which allegedly constitutes the reckless and criminally negligent conduct of the defendant is the actual injection of heroin by the defendant into the deceased’s body, knowing at *533 the time that she was ‘ ‘ high ’ ’ on barbiturates. On the other hand, in the Pinckney case, the alleged act was the selling of heroin to the deceased who then injected himself with the drug.
Admittedly, our knowledge of the subject of drug abuse, its cure and treatment is, at best, peripheral. Indeed, there remains a great deal of work to be done if we are ever to successfully combat this evil. I am in accord with Mr. Jerry Finkelstein, the distinguished publisher of the New York Law Journal, who maintains that it is imperative that we dedicate all of our available funds, resources and talent to the solution of this problem. He equates the kind of effort required to that which was put forth in the successful Manhattan Project resulting in the discovery of the atomic bomb.
Although our knowledge and information is incomplete at this point, it is indisputable that as a result of illicit heroin abuse, 1% of the addict population dies every year. Moreover, heroin is the single leading cause of death of adolescents and young adults from the ages of 15 to 35 in the Metropolitan New York area.[1] Approximately 50% of these deaths involve teenagers, and two thirds are so sudden that the needle is usually still found in the victim when the ambulance arrives.[2] It is estimated that 200 American troops in Southeast Asia will have died from heroin overdose in the year 1971.[3]
‘ ‘ The complications associated with heroin addiction are many and relate mainly to the way illicit heroin is produced and consumed rather than to the effects of the drug itself. The most serious problem is that of overdose. The marked variability in heroin concentration makes it apparent that any given number of bags injected regularly may at any one time easily contain a lethal concentration of heroin. The impressive statistics concerning mortality, secondary to heroin dependency, have already been stated. It should be noted that sudden death following heroin injection may not be related solely to the heroin but may represent a severe allergic reaction to one of the adulterants, as well as an additive effect of another abusive drug taken simultaneously. ” (N. Y. L. J, Dec. &, 1971,1 ‘ Heroin: A Hazardous Escape from Reality ’ ’ by Dr. Barry gtimmel, p. 26, col. 5).
*534 Narcotic deaths usually occur either instantaneously after a person injects himself from an allergic reaction to the drug or a result of true intoxication. In the latter instance, after the heroin is injected, it is converted to morphine, and thereupon brings to bear a detrimental or depressing influence on the nervous system, principally the respiratory centers, and the person slowly lapses into respiratory collapse, and is comatose. This process may consume several hours following the time of the injection.
It is difficult to say with any medical certainty what amount of heroin it would take to kill an ordinary person. In reality, it depends upon one’s tolerance. In other words, it would take more to kill an addict as opposed to a nonaddict. It has been estimated that in order to kill a nonaddict, it would require a dose of 30 to 60 milligrams of heroin, and for an addict, it would require slightly more. (Taken from the testimony of Dr. Dal Cortivo when he testified before the Grand Jury in this case.)
Precisely what constitutes a reckless or criminally negligent act has been a persistent problem faced by courts and Legislatures. Criminal negligence and recklessness have always required something more than simple negligence to support a civil action for damages. However, what that extra something is has always troubled the courts. The distinction between reckless and criminally negligent conduct is not in the nature of the risk but rather in the mental state required for each. The reckless offender is aware of the proscribed risk and consciously disregards it. Knowledge on the part of the defendant is essential. There not only must be an awareness on his part of the considerable risk involved but he must also be conscious of the serious consequences which may ensue were he to fail to consider them and notwithstanding the perils involved, he nevertheless engaged in conduct which was highly culpable and wanton. On the other hand, the criminally negligent offender is not aware of the risk created and hence cannot be guilty of consciously disregarding it.
The Court of Appeals in the recent case of People v. Haney (30 N Y 2d 328, 333), decided May 5, 1972, defines the risk as follows: “ ‘ Appreciably greater than that required for ordinary civil negligence by virtue of the ‘ ‘ substantial and unjustifiable ’ ’ character of the risk involved and the factor of “ gross deviation ” from the ordinary standard of care ’”.
In the Haney case (supra, p. 335), the Court of Appeals reversed a lower court’s order dismissing an indictment for *535 criminally negligent homicide and in the course of its opinion, said: “ What amounts to a violation of this section depends, of course, entirely upon the circumstances of the particular conduct. Whether in those circumstances the act or acts causing death involved a substantial and unjustifiable risk, and whether the failure to perceive it was such as to constitute a gross deviation from the standard of care which a reasonable man would have observed under the same circumstances, are questions that generally must be left directly to the trier of the facts ’ \ The court went on to say (p. 335) “While it is difficult to clarify further these questions (cf. People v. Eckert, 2 N Y 2d 126, 130; People v. Angelo, 246 N. Y. 451, 457) it would seem sufficiently clear that for proper determination of these questions, two main considerations should be emphasized. Firstly, criminal liability cannot be predicated upon every careless act merely because its carelessness results in another’s death; and secondly, the elements of the crime ‘ preclude the proper condemnation of inadvertent risk creation unless “ the significance of the circumstances of fact would he apparent to one who shares the community’s general sense of right and wrong”’.” (Emphasis added.)
“ Where casual, or slight negligence ends, and gross negligence begins may be difficult to determine, but essentially the issue is predominantly one of fact and not of law. Where there is room for the trier of the facts to draw different conclusions certainly the issue is one of fact.” (Mosser v. Hults, 10 A D 2d 771.)
In People v. Johnson (68 Misc 2d 937), a seller of heroin was indicted for reckless murder of the purchaser of the drugs who had injected such drugs into herself and died. The court held that the Pinckney case was distinguishable upon its facts and that under the facts and circumstances of its own case, there was presented sufficient evidence to sustain the indictment and that a jury should determine the issues of fact upon the trial.
It has been held that the act of injecting heroin into another’s body is an inherently dangerous act. (People v. Poindexter, 51 Cal. 2d 142, People v. Hopkins, 101 Cal. App. 2d 704, People v. Cline, 270 Cal. App. 2d 328, Silver v. State, 13 Ga. App. 722, Brown v. Commonwealth, 219 Ky. 406.)
In assessing the criminal responsibility of the defendant, it is incumbent upon the trier of the facts to weigh and consider the nature and purpose of the defendant’s conduct and the nature and degree of the risk consciously disregarded by the *536 defendant and all the circumstances known to the defendant in acting.
In the instant case, there are a number of factual issues for a jury to decide that are relevant to the determination as to whether the defendant’s acts constituted a substantial and unjustifiable risk of death, namely:
(1) Was the injection intravenous or subcutaneous?
(2) Was the deceased “high” on barbiturates at the time the defendant injected her with heroin?
(3) Did defendant know, or should he have known, under the circumstances, that the deceased was ‘ ‘ high ’ ’ on barbiturates at the time of injecting her with heroin?
(4) Did the defendant supply the deceased with the heroin or the implements to administer the heroin?
(5) Did defendant know, or should he have known, under the circumstances, the quantity or quality of heroin he was injecting into deceased’s body?
(6) Did the defendant know, or should he have known, under the circumstances, whether the deceased had developed a tolerance for heroin?
(7) Did the defendant know, or should he have known, under the circumstances, whether the quantity he injected was the deceased’s regular dosage?
Prom a careful study and analysis of the majority of prevailing legal precedents in the United States as well as the medical studies made and statistical data compiled, one can reasonably conclude that the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous and does carry a high probability that death will occur. It is not unreasonable to conclude that the injection of heroin into the bloodstream of a human being constitutes a substantial and unjustifiable risk of death. (People v. Poindexter, supra; People v. Hopkins, supra; Silver v. State, supra; People v. Cline, supra, and Brown v. Commonwealth, supra.) It is, therefore, proper for the triers of the fact to determine whether or not the aforesaid defendant’s alleged actions constitute the indictable offense of homicide, and this issue, should not be resolved by the court as a matter of law. (People v. Haney, 30 N Y 2d 328, supra, Mosser v. Hults, 10 A D 2d 771, supra, and People v. Johnson, 68 Misc 2d 937, supra.)
Upon inspecting the Grand Jury minutes and considering the totality of the circumstances surrounding the defendant’s con *537 duct, the court therefore concludes that there was sufficient legal evidence before the Grand Jury to warrant an indictment for manslaughter in the second degree and criminally negligent homicide.
Defendant’s motion to dismiss the second and third counts of the indictment is accordingly denied.
Branches 2 and 3 of defendant’s application are granted to the extent that a hearing shall be conducted in Part I of this court on August 7, 1972, the date assigned for trial.

. Halpern, M., Fatalities Due to Intravenous Narcotism, presented at the Eastern Regional Psychiatric Assn. Meetings, New York, 1971.

. Report of Social Study Mission: World Heroin Problem, United States Govt. Print. Off., No. 60-576-0, p. 3, Washington, D. C., 1971.

. Richter, R. W., Baden, M., and Pearson, J., Mortality — Heroin Addiction, A. M. A. Med. News, J. A. M. A., 212:967,1970.