[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1003 
The appellant was indicted and convicted for murder in the first degree by giving heroin to David Archie Owings and sentenced to life imprisonment. He is represented by court appointed counsel both at trial and on appeal.
Four issues are presented on appeal: (1) The sufficiency of the indictment; (2) a claim of double jeopardy; (3) the sufficiency of the evidence which includes (4) an allegation that the appellant was convicted on the uncorroborated testimony of accomplices.
In February of 1976, David Archie Owings, age twenty-one years, of Birmingham, Alabama, contacted his friend Ronald Dale Quarles, age twenty-three, of Mobile, Alabama. Owings had "come into" some money, about fifty thousand dollars, and wanted Quarles to arrange the purchase of a large quantity of marijuana by contacting the appellant, Damon Shelton Napier. Owings knew that the appellant could locate the marijuana. Quarles was also familiar with the appellant. The appellant had previously supplied morphine and heroin to Quarles and his wife.
On Thursday, February 26, 1976, Quarles, his wife Deborah Diane, and the appellant met Owings at the Mobile airport. Owings had come to Mobile so they could all go to Mexico and "set up a dope buy". The four went to the apartment of the appellant where they picked up the appellant's wife, Sandy, and another girl, Catherine Cook. From there, the crew of six departed for Nogales, Arizona, which is located on the international boundary between the United States and the Republic of Mexico. They all went in Quarles' van, the appellant having agreed to pay for the gas and to pay Quarles "some money" for the trip.
The group went to Mexico for the express purpose of merely "setting up" a marijuana buy. They did not intend to make the actual purchase on this trip.
By driving continuously, the group arrived in Nogales around 3:30 on the morning of February 27th. They found a hotel room where they spent the remainder of the night. Later that morning, Owings, Quarles, and the appellant left for Nogales, Mexico, leaving the three women at the hotel. The appellant had a Mexican connection with whom the three met and discussed the purchase of some marijuana. The negotiations were conducted both in Spanish and English between the appellant and the Mexican.
After the negotiations, Quarles returned to the Arizona side of Nogales and got the three women who had been waiting at the hotel. They crossed the border into Mexico and met Owings and the appellant at a bar. Quarles and the appellant then went to the Mexican's house while Owings and the women went shopping.
Following the appellant's directions, Quarles drove the two of them to the house of the Mexican connection. At the house, they received one ounce of heroin packaged in a condom. Although Quarles did not hear any of the negotiations or see any money exchanged, he testified that the appellant paid one thousand dollars for the heroin. There was no testimony that Owings gave the appellant the money for this purchase. Both Quarles and the appellant sampled the heroin and found that it was "good". Four or five hours later they returned to Nogales.
They met Owings and the women in a lounge. At this time, Quarles was obviously heavily under the influence of heroin. This conclusion was based upon the testimony of Quarles' wife who stated that she had observed her husband under the influence of heroin "countless" times. The evidence is conflicting as to whether Deborah Diane received the heroin from the appellant or *Page 1004 
her husband. However once she had possession of the heroin, without instruction, she immediately went to the bathroom and inserted the heroin-filled condom into her body. This permitted the party to smuggle the heroin over the border.
When the party was a couple of hours into Arizona, Deborah Diane removed the condom from her body and returned it to the appellant. She was given a sample of the heroin. In spite of the fact that she had been using heroin for six or seven months, she "just about" overdosed and had to be revived.
On the morning of March 1, 1976, the party arrived in Mobile. After taking Catherine Cook home, they went to the appellant's apartment where the appellant gathered the equipment he would need to "cut" the heroin. This included a bottle of dextrose and a set of scales. Then the appellant, his wife, and their two or three year old child, drove to the Quarleses' apartment. The Quarleses and Owings reached the same destination in Quarles' van. At this time there were no narcotics in the Quarleses' home.
Shortly after arriving, the appellant began the process of cutting the heroin with dextrose. The appellant had purchased "Mexican Brown" heroin of high but unknown purity. In cutting it to produce the twenty-five dollar "bags" for sale on the street, the appellant had, at the same time, to be sure that the "cut" was sufficient to meet the requirements of his customers and yet adulterated enough to maximize his profits. To solve this problem, the appellant simply asked his "friends" to "test the dope to see what would be a good $25.00 bag to sell".
The appellant gave heroin to Steve Rhodes, who had been using heroin for a year and who had been living with the Quarleses; to Deborah Quarles, who had been using the narcotic for six or seven months; to Ronald Quarles, who had been using for about a year; and to David Archie Owings, who had never used heroin before. The appellant gave them samples of the heroin he was cutting because he wanted to know how good it was. For Owings, the Monday before Mardi Gras, March 1, 1976, would be the last day of his life.
Each of these individuals had two injections of heroin about one hour apart. Rhodes and Quarles agreed that the heroin cut by the appellant that day was much stronger than the street heroin he had previously been selling them.
The appellant did not force or coerce Owings to accept the heroin and Owings injected the narcotic into his own body. Owings took his first shot between one and two o'clock P.M. and little effect was noticed. About one hour later he took another shot and immediately went to sleep. He would never fully regain consciousness.
Despite the fact that Owings had never used heroin before, he was no stranger to the drug world. Quarles testified that he had known Owings in Birmingham and that there they had shot up anything they could get their hands on; "THC[1], MDA,[2] cocaine, barbituates, anything we could find". Mrs. Quarles testified that Owings had been selling dope in Birmingham.
After the appellant finished cutting the heroin, he left the narcotic at the Quarleses' home because his apartment was too well known to the police.
During the night, it was noticed that Owings was having difficulty breathing. He could not be awakened. He was placed in a bathtub and cold water was poured over him. Rhodes and Quarles tried to get him to walk. The appellant was called and returned to the Quarleses' home. He poured water on Owings and placed ice cubes in the bathtub. After Owings seemed to revive a bit the appellant left and Owings was put back to bed.
The next morning Owings was found cold and dead. Rhodes took the heroin to the appellant who hid it. At trial each witness testified that he had no financial interest in *Page 1005 
either the purchase or sale of the heroin and that it "belonged" to the appellant.
Les Solomon was a friend of the Quarleses and an acquaintance of the appellant. He did not use heroin and was not involved with narcotics. On March 1, 1976, Solomon and another friend, Jeff Baker, were on their way home to Birmingham after having been to New Orleans for Mardi Gras when they decided to drop in on the Quarleses. They intended to spend the night and catch Mardi Gras in Mobile the next day.
Solomon arrived at the Quarleses' home at about five o'clock on the afternoon of March 1st. At that time the appellant had finished cutting the heroin but was still in the kitchen where he had been cutting it. Solomon saw the appellant in the kitchen and the scales he had used to cut the heroin. The appellant told him that "they had copped some (Mexican heroin) down there and he had just cut it". The appellant left the Quarleses' home thirty or forty minutes after Solomon arrived. It was Les Solomon who found Owings' body the next morning.
A state toxicologist, after being properly qualified as an expert, testified that on being injected, heroin is quickly converted to morphine. The quantities of morphine in Owings' body were consistent with death by overdose of heroin. No other drugs were detected. The toxicologist testified that in his opinion death was due to an overdose of narcotics.
Besides attending the autopsy of the deceased and receiving several tissue samples, the toxicologist also examined and tested a packet of suspected heroin that the appellant had cut. The toxicologist testified that the contents of the packet proved to be 36.5% pure heroin. Street heroin is normally only 2 to 6% pure.
Dr. F.T. Boudreau, a County Pathologist in the Mobile County Coroner's Office, performed an autopsy on the deceased. In his opinion the deceased died of pulmonary complications of acute narcotism or, in other words, of an overdose of heroin. Dr. Boudreau found that there was "generalized organ congestion involving all of the organs" which is "the universal finding of this type of death". He stated that in his opinion, the deceased was not an addict and although he found recent injection marks inside Owings' elbows, he found no old marks. According to Dr. Boudreau, heroin is an organic poison and a dangerous drug of no therapeutic value.
 I
The appellant initially contends that the trial court erred in overruling his demurrer to the indictment because that indictment failed to allege the means of the killing. The appellant specifically denotes that the indictment contains no allegation that the appellant knew of the dangerous nature of the drug in question, knew that the deceased would die, administered the drug or aided in its being administered.
The indictment charged murder in the first degree. It states as follows:
 "DAMON SHELTON NAPIER, whose name is to the Grand Jury otherwise unknown than as stated, did unlawfully and with malice aforethought kill David Archie Owings by perpetrating an act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, to-wit: the said Damon Shelton Napier gave the said David Archie Owings heroin, knowing that the said David Archie Owings would inject the heroin and as a result of injecting such heroin, the said David Archie Owings died, against the peace and dignity of the State of Alabama."
Heroin is a poison. 28 C.J.S. Supp., Drugs Narcotics § 3, p. 10, citing Tidd v. Skinner, 225 N.Y. 422, 122 N.E. 247
(1919). At trial, the coroner's pathologist testified that heroin was an organic poison.
It has been held that an indictment is sufficient which alleges that the defendant "did unlawfully and with malice aforethought kill (the deceased) by administering to him a quantity of morphine". Scott v. State, 141 Ala. 1, 37 So. 357
(1904).In *Page 1006 Scott, the Alabama Supreme Court noted that
 "It was not necessary to aver how the drug was administered, or the particular way in which it affected him, nor that the drug was a poison or the quantity which was administered. The administration of a quantity of morphine is shown by this averment to have been the means employed to kill, and that is all that is required."
Scott, 141 Ala. 5, 37 So. 358.
Here the indictment alleged in effect that the appellant did unlawfully and with malice aforethought kill the deceased by giving him heroin, knowing that the deceased would inject such heroin. The indictment alleged that Owings did die as a result of injecting the heroin and further alleged that the act of giving heroin was "an act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life". These allegations would even satisfy the requirement ofLangham v. State, 243 Ala. 564, 11 So.2d 131 (1943) requiring that where the drug or substance administered to the deceased is not a matter of judicial knowledge poison, the indictment should aver that the substance was poison or was such as was calculated to destroy human life.
Moreover, it need not be alleged that the accused knew that the substance administered was a deadly poison. See Warren onHomicide, Vol. II, pp. 63-64.
In short, the indictment alleged that the appellant killed Owings by giving him heroin. The indictment was proper in all particulars and adequately alleged the means of the killing. The appellant's demurrer was due to be overruled.
 II
The appellant contends that the trial court also erred in granting the state's motion to strike his plea of autre fois
convict. On March 1, 1977, this court affirmed the conviction of the appellant for giving away heroin to Steven Rhodes, one of the witnesses in this case, in violation of the Alabama Uniform Controlled Substances Act. As the appellant asserts, it does appear that that conviction and his present one arise out of the same general factual situation. Yet the two offenses are not the same in law and in fact. A plea of former jeopardy is unavailing unless the offense presently charged is precisely the same in law and fact as the former one relied on under the plea, even if both cases are founded on the same facts. Racinev. State, 291 Ala. 684, 286 So.2d 896 (1973). The corpus delicti of distributing heroin to one person and the first degree murder of another individual by giving him heroin have not one single element in common. The plea of former jeopardy was properly overruled.
 III
The appellant argues that there was no proof of malice or intent to kill the deceased and therefore his motion to exclude the state's evidence was due to be granted. This is the major issue presented by this appeal. It may be concisely stated as follows: Does the furnishing of heroin to another person knowing that he will inject the drug, with death resulting, constitute murder in the first degree.[3]
A careful review of the case law in this area reveals no case wherein a heroin dealer or supplier has been convicted of murder in the first degree, under any theory, for the act of selling or giving away heroin to an individual who voluntarily injects the same quantity of heroin into his body and dies as a result thereof. However in no case have facts and circumstances been presented which rival those present in the case at hand. *Page 1007 
Murder is the unlawful killing of a human being with malice aforethought. Hornsby v. State, 16 Ala. App. 89, 75 So. 637
(1917). In Alabama, murder in the first degree is divided into four classes according to mental intent. Mitchell v. State,60 Ala. 26 (1877). Title 14, Section 314, Code of Alabama 1940 lists the four classes of first degree murder: (1) Premeditated intent-to-kill murder; (2) murder in the commission of certain enumerated felonies; (3) murder of an unintended victim where the intent was to kill another; and (4) depraved mind or heart murder sometimes referred to as murder resulting from universal malice.
The appellant was indicted for murder in the first degree under the fourth class. The material portions of Title 14, Section 314, provide that:
 "Every homicide, . . . perpetrated by any act greatly dangerous to the lives of others and evincing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life, is murder in the first degree."
This provision was given its authoritative construction inMitchell v. State, 60 Ala. 26 (1877).
 "The act, to come within this class, must be greatly dangerous to the lives of others; must be of such character as to evidence — prove — that the offender had a depraved heart, regardless of human life; and must be without any preconceived purpose to deprive any particular person of life."
* * * * * *
 "We think the legislature, in this clause, intended to raise to the high grade of murder in the first degree those homicides which are the result of what is called `universal malice'. By universal malice, we do not mean a malicious purpose to take the life of all persons. It is that depravity of the human heart, which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim. The supreme depravity shown in this so-called universal malice, is considered as the equivalent of the strong adjectives, willful, deliberate, malicious, and premeditated, which characterize the first class of murder in the first degree." Mitchell at 30-31.
Typical illustrations of the doctrine of universal malice are wilfully riding an unruly horse into a crowd, and throwing a timber from a roof into a crowded street. Moore v. State,18 Ala. 532 (1851). Other examples are shooting a firearm into a crowd or into a train, dwelling house or automobile containing occupants. Bailey v. State, 133 Ala. 155, 32 So. 57 (1901);Johnson v. State, 203 Ala. 30, 81 So. 820 (1919); Washington v.State, 60 Ala. 10, 31 Am.Rep. 28 (1877); see also Gallant v.State, 167 Ala. 60, 52 So. 739 (1910) (setting off explosion beneath a house); Presley v. State, 59 Ala. 98 (1877) (placing obstacles on railroad track); Langford v. State, Ala.Cr.App. 1977, 354 So.2d 297 (driving an automobile in a grossly wanton manner).
However summarily and ambiguously this type of malice may have been treated by the early writers, the doctrine of universal malice is but a special application of the doctrine of implied malice applicable in those cases where the evidence positively shows the lack of malice toward any particular individual. Universal malice is a logical offshoot of the doctrine of implied malice which comprehends not only a particular ill will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. See: B. Gegan, Criminal Homicide in the Revised New York Penal Law, 12 New York Law Forum 565, 582 (1966); A. Funk, Jr., TheDevelopment of the Doctrine of Implied Malice in the Law ofMurder, 34 Kentucky Law Journal 160 (1946). The doctrine is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual.Longinotti v. People, 46 Colo. 173, 102 P. 165 (1909); nor is it essential that an intent to kill exist. Indeed the existence of such an intent would remove the act from the *Page 1008 
purview of this class of murder in the first degree. Mitchell.
By statutory definition, a homicide, to come within the purview of first degree depraved heart murder, must (1) be greatly dangerous to lives of others and (2) evince a depraved mind regardless of human life.
A "greatly dangerous act" is one which involves a "very high degree" of risk of serious bodily injury or death.
 "Grossly negligent conduct, or reckless conduct, which results in death may serve as the basis for manslaughter liability, but it will not do for murder. For murder the degree of risk of death or serious bodily injury must be more than a mere unreasonable risk, more even than a high degree of risk. Perhaps the required danger may be designated a `very high degree' of risk to distinguish it from those lesser degrees of risk which will suffice for other crimes. Such a designation of conduct at all events is more accurately descriptive than that flowery expression found in the old cases and occasionally incorporated into some modern statutes — i.e., conduct `evincing a depraved heart, devoid of social duty, and fatally bent on mischief'. Although `very high degree of risk' means something quite substantial, it is still something less than certainty or substantial certainty. The distinctions between an unreasonable risk and a high degree of risk and a very high degree of risk are, of course, matters of degree, and there is no exact boundary line between each category; they shade gradually like a spectrum from one group to another." LaFave and A. Scott, Criminal Law 542 (1972).
While the ancient concept of "depravity" must still be satisfied under our statutory definition of universal malice, "depraved" is a "Sunday word with a distinct moral connotation". R. Moreland, A Re-Examination of the Law ofHomicide In 1971: The Model Penal Code, 59 Kentucky Law Journal 789, 796 (1971). The word is a historic survivor of the common law and is outmoded and ambiguous. Moreland at 796. Translated into understandable terms, a depraved mind is one revealing an extreme indifference to the value of human life. Moreland at 787. Professor Moreland stated that if he correctly interprets the attitude of the common law, one who commits a negligent or depraved murder has the mental attitude, "I don't give a damn if I do kill somebody by my extremely dangerous act". He equates this intent as "conduct wantonly disregardful of the lives and safety of others". Moreland at 797.
Professor Perkins suggests that the phrase "wanton and willful disregard of unreasonable human risk" will adequately describe those acts which, because of their nature and the manner in which they are conducted, may constitute malice aforethought (first degree murder) even if there is no actual intent to kill or injure. Perkins, A Re-Examination of MaliceAforethought, 43 Yale Law Journal 537, 555-557 (1934). Perkins describes wanton conduct as:
 "something different from negligence however gross — different not merely in degree but in kind, and evincing a different state of mind, so callously heedless of harmful consequences known to be likely to follow that even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong." Perkins, Criminal Law 783 (1969).
Thus, from the above, we conclude that the phrase "greatly dangerous to the lives of others, and evidencing a depraved mind" means an act which, as stated, is greatly dangerous and constitutes a very high degree of risk of death or bodily harm to others. The act must evince an extreme indifference to the value of human life and be indicative of the "I don't give a damn" attitude described by Professor Moreland.
Expert testimony presented by the state proved that heroin is recognized as an "organic poison". See also: 28 C.J.S. Supp., Drugs and Narcotics § 3, p. 10. Under the Alabama Uniform Controlled Substances Act heroin is listed as a "schedule I" substance. Title 22, Section 258 (29)(c)(10). A *Page 1009 
substance in this schedule has "a high potential for abuse and has no accepted medical use in treatment" or "lacks accepted safety for use in treatment under medical supervision". Title 22, Section 258 (28).
Heroin is also an inherently dangerous drug and its injection into the bloodstream of a human being constitutes a substantial and unjustifiable risk of death.
 "From a careful study and analysis of the majority of prevailing legal precedents in the United States as well as the medical studies made and statistical data compiled, one can reasonably conclude that the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous and does carry a high probability that death will occur. It is not unreasonable to conclude that the injection of heroin into the bloodstream of a human being constitutes a substantial and unjustifiable risk of death." People v. Cruciani, 70 Misc.2d 528, 334 N.Y.S.2d 515, 523
(1972). Emphasis added.
While heroin is a truly dangerous drug, it is also an accepted fact that the injection of heroin into the body does not generally cause death in the normal heroin transaction. This fact is offset by the additional fact or circumstance that in this particular case there is evidence that Mrs. Quarles almost overdosed and had to be revived on the return trip from Mexico. This was sufficient to give the appellant a knowledge or foreseeability of the danger present in this particular quantity of heroin.
Other factors which indicate that this act was committed with depravity or extreme indifference to human life are: (1) The heroin was of an unknown strength and quality; (2) the appellant was solely responsible for "cutting" the narcotic; (3) the appellant gave everyone two doses of heroin within a one hour period and "administered" the dosage by "shoveling" the heroin off into the spoon of each person; (4) the appellant was in the process of determining the strength of the heroin when the two doses were given to the deceased; (5) the users indicated to the appellant that the heroin was stronger than their normal dosage; (6) the cut and packaged heroin was approximately six to eighteen times the strength of the normal street dosage; (7) the appellant had secured the heroin for profit and not merely to give pleasure to his friends; and (8) the appellant did not seek medical attention for the deceased when he was informed of the overdose.
Thus, viewing the entire circumstances, we have the basic elements of a depraved heart or wanton murder: (1) An act greatly dangerous to the lives of others and (2) performed in a manner strongly indicating that the actor "simply didn't give a damn". Admittedly, the giving of heroin to another does not appear initially to fit within that type of action which has traditionally been described as evincing a depraved heart. Admittedly, the mere furnishing of heroin to another does not evidence a depraved mind. However this was not the usual or ordinary heroin transaction. Here we have three circumstances that we cannot ignore: (1) The fact of the prior overdose; (2) the fact that the heroin was of strong but unknown purity and strength; and (3) the fact that the state proved that heroin was an organic poison. Certainly no one could argue with the proposition that the giving of an unknown quality of poison to another in order to determine how strong that poison is constitutes an act evidencing a depraved mind and one in gross disregard of human life. The fact that heroin is generally not considered a poison is of no consequence where, as here, the state proved it is.
We will not belabor this point any further. The particular facts and circumstances preceding and surrounding the act of the appellant were sufficient to permit the jury to infer that the appellant actually knew that his conduct was extremely dangerous to human life.
In reaching this conclusion we have considered the other cases which have dealt with the issue of a depraved heart murder arising from a furnishing of heroin and *Page 1010 
resulting death. Our conclusion in no way conflicts with the holdings of those two cases. Although each case involved indictments for murder under the depraved heart or universal malice doctrine, the murder was defined by statute as second degree murder.
In People v. Johnson, 68 Misc.2d 937, 329 N.Y.S.2d 265 (1972) the defendant was indicted on a charge of second degree murder by "recklessly engag(ing) in conduct which creates a grave risk of death to another person" under "circumstances evincing a depraved indifference to human life". N.Y. Penal Law, Section 125.25 (2) (McKinney 1967).
The defendant moved to dismiss the murder charge on the grounds that the sale of a dangerous drug, with the resultant death of the user who self-administered the drug, does not constitute homicide, and that even if such conduct does amount to homicide, it should not be considered murder.
The court denied the motion to dismiss for the reason that the indictment raised questions of fact as to whether the circumstances and the conduct of the defendant evinced a depraved indifference to human life and whether there was evidence of reckless conduct or course of action which created a "grave risk of death" to another person which caused death.
 "To put it precisely, if proven, what were the `natural and probable consequences' of a sale of heroin to a minor 17 years of age? And, if proven, was the conduct so reckless as to create a grave risk of death and cause the death of that person." Johnson
at 329 N.Y.S.2d 267.
A search of Shepard's Citations does not disclose the outcome of this case on trial, if, indeed, it was tried.
The other case considering the doctrine of universal malice in connection with a death from a heroin overdose isCommonwealth v. Bowden, 456 Pa. 278, 309 A.2d 714 (1973). There the defendant was found guilty of murder in the second degree. At trial medical testimony was produced that death was caused by an adverse reaction to an injection of heroin. However the medical examiner stated that the amount of narcotic taken by the deceased was consistent with that taken by an addict and death would be unexpected or unforeseeable from such a dose in an addict. In the case under review, each witness that testified that he or she had used heroin for a period of time also testified that he or she was not addicted and was not an addict.
The Pennsylvania Supreme Court noted the general rule of universal malice:
 "When an individual commits an act of gross recklessness for which he must reasonably anticipate that death to another is likely to result, he exhibits that `wickedness of disposition; hardness of heart; cruelty; recklessness of consequences and a mind regardless of social duty' which proved that there was at that time in him `that state or frame of mind termed malice'." Bowden, 309 A.2d 717-718.
However the court refused to apply depraved heart murder doctrine liability to the conduct of the defendant because there was no reasonable anticipation of death involved.
 "Initially, although we recognize heroin is truly a dangerous drug, we also recognize that the injection of heroin into the body does not generally cause death."
The court pointed out that under the facts of this particular case, the defendant knew that the deceased was an addict, had used heroin with him for a period of time, knew the deceased's tolerance to heroin, knew the quantity of heroin he injected into the deceased was his normal dosage and knew that this dosage had never adversely affected the deceased before in the times he had used the drug. None of these mitigating factors is present in the case under review.
In both Johnson and Bowden the imposition of homicidal liability was based on the court's perception of the inherent dangerousness or overdose potential of the administration of heroin. In other words, liability was only imposed where the defendant could have reasonably anticipated that death was likely to occur. Bowden, 309 A.2d 718. That foreseeability was present in this case. *Page 1011 
 IV
Finally the appellant contends that the trial court erred in denying his motion to exclude on the grounds that he was convicted on the uncorroborated testimony of accomplices.
In Napier v. State, Ala.Cr.App., 344 So.2d 1235 (1977) this court held that:
 "The proper way to determine if a witness is an accomplice is, could the witness have been indicted and convicted of the offense charged either as principal or accessory. If he could not, he is not an accomplice."
There we held that the witness Rhodes was not an accomplice to the appellant under an indictment charging him with the possession of narcotics.
Under the evidence before this court, the testimony of Les Solomon, who arrived only after the heroin had been cut and had "nothing to do with it", was sufficient to corroborate the testimony of the Quarleses and Steven Rhodes even if they be considered accomplices. We need not pursue this issue further. Not only was the appellant a peddler of decadence but, in this instance, he was a dealer of death. Under these circumstances the evidence was sufficient to support a conviction for murder in the first degree.
The evidence presented by the state, if believed by the jury, is sufficient to sustain the jury verdict finding the appellant guilty as charged in the indictment. The court did not err in overruling the appellant's motion to exclude the evidence.
In concluding, we note that this was the first televised trial to be conducted in the State of Alabama. Such proceedings are authorized by the Plan for News Media Coverage and Other Recordation of Trials and Other Proceedings in the Circuit Court of the Thirteenth Judicial Circuit Under Canon 3A(7) and 3A(7A) Alabama Canons of Judicial Ethics. While all we have to review is a written transcript of the proceedings, we commend the trial judge for his maintenance of the dignity and decorum appropriate to the trial of so serious a charge as murder in the first degree. The record reveals no disruption or distraction which interfered with the administration of justice and the trial of the cause.
We have reviewed the record and found no error prejudicial to the appellant. Therefore the judgment of the trial court is due to be and is hereby
AFFIRMED.
All Judges concur.
[1] THC, Tetrahydrocannabinol is the active ingredient in marijuana.
[2] MDA, Methylenedioxy Amphetamine.
[3] Generally see: W. Cohen, Heroin Deaths: HomicidalResponsibility of the Seller in New York, 37 Albany Law Review 497 (1973); B. Becker, Prospective Homicidal Responsibility forthe Heroin Dealer in Arizona, 97 Arizona State Law Journal 97 (1975); J. Weissman, Imposing Homicide Liability forDeath-Producing Drug Law Violations, 12 California Western Law Review 102 (1975); Annotation: Homicide: Criminal liability for death resulting from unlawfully furnishing intoxicating liquor or drugs to another, 32 A.L.R.3d 589.