Barry Shirah was indicted for the offense of manslaughter, in violation of § 13A-6-3, Code of Alabama 1975. The jury found the appellant guilty of the lesser included offense of criminally negligent homicide. The appellant was sentenced to one year in the county jail.
On the night of April 13, 1987, Michael Shane Nelson (the victim), Marlene Nelson (the victim's sister), Karland Thompson, and the appellant gathered at Angela Davis's apartment. At some point, the group went to a liquor store where Davis purchased some beer and the appellant bought some whiskey. On the way back to Davis's apartment, the group smoked a joint of marijuana. Once back at Davis's apartment, everyone began drinking. Several other people came by during the course of the night. When the liquor ran out, the appellant stated that he knew where he could get some morphine. Shortly thereafter, the appellant and the victim left the apartment. When they returned, the appellant had a glass with a clear liquid in it. Thompson asked what was in the glass and the appellant said that it was morphine. The appellant went to the kitchen and mixed the morphine with some Sprite in a glass. He then brought the glass containing the mixture into the living room. Marlene took a sip from the glass, and the victim drank about half the glass. The appellant also drank the mixture.
The group then spent the night at Davis's apartment. When Davis tried to wake the victim the next morning, she could not arouse him. The victim was not breathing and was turning blue. When the victim would not wake up after he was placed in the shower, the police and paramedics were called.
Dr. Gary Dean Cumberland performed the autopsy on the victim. The only finding he could make from the autopsy was that there was congestion of the organs. Cumberland took blood, urine and liver samples from the victim's body and sent them to the toxicologist. Based on information supplied to him by an investigator with the Department of Forensic Sciences and the results of the toxicology report, Cumberland stated that, in his opinion, the victim died as a result of a morphine and Secobarbitol overdose. He testified that the toxicology report indicated that the level of morphine in the victim's body was *Page 809 
0.08 micrograms per milliliter. He stated that "[what] we like to see before we will call an overdose from morphine alone is .05 micrograms per milliliter." (R. 192.) Cumberland stated that, in his opinion, the level of morphine in the victim's body at the time of the autopsy would have been enough, by itself, to have caused death. The amount of Secobarbitol present in the victim's body was not a sufficient amount to have caused death. However, the victim's body did have five hyperemias, which is consistent with a barbitol overdose. Cumberland testified that morphine is a central nervous system depressant, and in this case, the morphine in the victim's body was present "in high enough levels that it depressed the central nervous system to the point that it stopped breathing." (R. 201.) He stated that Secobarbitol "works essentially the same way" and "it has an added effect." (R. 201.)
Matthew Tolbert Barnhill, a toxicologist with the Department of Forensic Sciences, received the blood, urine, and liver tissue samples which were taken during the autopsy of the victim's body. The blood sample was negative for the presence of alcohol. However, Barnhill testified that, due to the dissipation rate of alcohol, the presence of alcohol may not have been detected if the alcohol had been ingested some twelve hours before the victim died. Barnhill's tests did reveal the presence of Secobarbitol and morphine in the victim's body. The level of morphine was 0.08 micrograms per milliliter of blood and the level of Secobarbitol was 3.9 micrograms per milliliter of blood. Barnhill testified that morphine and Secobarbitol dissipate at different rates than alcohol. A first time user of morphine with a level of .08 micrograms per milliliter of blood at the time of death could have had a level of .32 micrograms per milliliter of blood in his body twelve hours earlier. The mortality range for the ingestion of morphine is from the level of .2 upwards but the average is .7 micrograms per milliliter of blood. Secobarbitol dissipates more slowly than morphine, and the amount of Secobarbitol in a person's body at the time of death would not have been much different twelve hours earlier.
Barnhill testified that Secobarbitol is a fast acting hypnotic and morphine is a very powerful pain killer or narcotic. Both Secobarbitol and morphine are central nervous system depressants.
Barnhill stated that, in his opinion, the cause of death in this case was an overdose of morphine and Secobarbitol. He testified that the amount of morphine in the victim's body at the time of death would not have been sufficient to cause death. However, if the morphine had been ingested some twelve hours earlier, then it could have been the cause of death by itself. Barnhill further testified that the average lethal level of Secobarbitol is 12 to 13 micrograms per milliliter of blood. A level of 3.9 micrograms per milliliter of blood would not be a risk of death unless it was used with alcohol. Alcohol would have reacted more with the Secobarbitol than with the morphine.
Dr. John Feldman, an oncologist, testified that he had treated the appellant's father for lung cancer from December of 1986 until his death in May of 1987. During this period, Feldman prescribed morphine in liquid and tablet form for the appellant's father. The appellant's father was also taking Secobarbitol, which is a barbituate. Feldman testified that morphine is probably the strongest pain reliever available. He stated that the use of morphine by a person who had not taken morphine previously, in an unsupervised situation, could be very dangerous, depending on the dose.
The appellant gave a taped statement to the police. During the course of his statement, the appellant gave several versions of what occurred that night. The last version the appellant gave was that he, Thompson, and the victim went to his house twice on the night in question to get morphine. The first time, Thompson took the morphine from the refrigerator and took it back to Davis's apartment. Thompson mixed a drink with the morphine, and the victim drank about half of the mixture in the glass. On the second trip to get morphine, the victim took the morphine from the refrigerator. The appellant said *Page 810 
he did not know if the victim drank any of this morphine.
 I
The appellant contends that the evidence was insufficient to support his conviction for criminally negligent homicide.
"A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence." Ala. Code, § 13A-6-4(a) (1975). "A person acts with criminal negligence with respect to a result or to a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Ala. Code, § 13A-2-2(4) (1975). Negligence "is distinguished from acting purposefully, knowingly, or recklessly in that it does not involve a state of awareness. It is the case where the actor creates inadvertently a risk of which he ought to be aware, considering its nature and degree, the nature and the purpose of his conduct and the care that would be exercised by a reasonable person in his situation." Commentary, Ala. Code, §13A-6-4 (1975).
In Napier v. State, 357 So.2d 1001 (Ala.Crim.App. 1977),rev'd, 357 So.2d 1011 (Ala. 1978), on retrial, 377 So.2d 1135
(Ala.Crim.App.), cert. denied, 377 So.2d 1138 (Ala. 1979), the defendant was charged with and convicted for the first degree murder (Title 14, § 314, Code of Alabama 1940) of David Archie Owings, who died as a result of two self-administered injections of heroin which were supplied to him by the defendant. This court upheld the defendant's conviction, but the Alabama Supreme Court reversed this court and held that "Napier's actions in giving Owings a quantity of heroin of unknown purity, while evincing a high degree of recklessness, does not exhibit the degree of malice necessary to support a conviction for murder in the first degree." Napier, 357 So.2d at 1014. Following the Supreme Court's decision, a new indictment was returned against the defendant for the offense of second degree murder. The trial judge declined to submit the offense of second degree murder to the jury and submitted the case to the jury on the offenses of manslaughter in the first and second degree. The jury found the defendant guilty of manslaughter in the first degree. On appeal, this court affirmed the defendant's conviction and held that a "definite intent to take a life is not necessarily an ingredient of manslaughter in the first degree." Napier, 377 So.2d at 1137. This court found that "wantonness" was sufficient to support the defendant's conviction.
 "[W]antonness occurs . . . when one is conscious of his conduct, and conscious from his knowledge of existing circumstances and conditions, that injury will likely result from his conduct, and, with reckless indifference to consequences, he consciously and intentionally does some wrongful act or omits some known duty which produces injury."
Napier, 377 So.2d at 1137.
This court's definition of wantonness in Napier is similar to the present definition of recklessness, § 13A-2-2(3), Code of Alabama 1975, which is necessary to support a conviction for manslaughter under § 13A-6-3, Code of Alabama 1975. Thus, inNapier, it was essential that the defendant was aware of the risk and disregarded that risk when he supplied the heroin to the victim. In the case at bar, to support the appellant's conviction for criminally negligent homicide, we need only find that the appellant should have been aware of the risk.
Thus, we must determine whether, under the particular facts and circumstances of this case, the appellant's act of making the morphine available to the victim created a substantial and unjustifiable risk of death to the victim, and whether this risk was of such a nature and degree that the appellant's failure to perceive this risk constituted a gross deviation from the standard of care that a reasonable person would observe in the situation. For a general discussion of this subject, see Ramirez, Homicide *Page 811 Liability for the Furnishing of Dangerous Narcotics, 6 St. Louis Pub.L.Rev. 161 (1987); Annotation, Homicide: CriminalLiability for Death Resulting from Unlawfully FurnishingIntoxicating Liquor or Drugs to Another, 32 A.L.R.3d 589 (1970).
Morphine is a "deadly poison." Langham v. State, 243 Ala. 564,567, 11 So.2d 131 (1942). See also Scott v. State,141 Ala. 1, 37 So. 357 (1904). Dr. Feldman, the appellant's father's oncologist, testified that morphine is "probably" the strongest pain reliever available and that its ingestion in an unsupervised situation could be very dangerous. Thus, we find that there was evidence that the appellant's conduct in this case created a substantial and unjustifiable risk of death. SeePeople v. Cline, 270 Cal.App.2d 328, 75 Cal.Rptr. 459 (1969) (trial judge's finding that the defendant's act of furnishing phenobarbitol to the victim was inherently dangerous to human life was supported by testimony by the pathologist that the consumption of phenobarbitol in unknown strength was dangerous to human life); People v. Cruciani, 70 Misc.2d 528,334 N.Y.S.2d 515 (1972) ("not unreasonable to conclude that the injection of heroin into the bloodstream of a human being constitutes a substantial and unjustifiable risk of death").But see People v. Pickney, 65 Misc.2d 265, 317 N.Y.S.2d 416
(1971) (Shapiro, J., concurring) ("proportion of [narcotic-related] deaths to the number of times narcotics are currently being used by addicts and for legal medical treatment is not nearly great enough to justify an assumption by a person facilitating the injection of a narcotic drug by a user that the latter is thereby running a substantial and unjustifiable risk that death will result from that injection"); Napier,357 So.2d 1011 ("accepted fact that the injection of heroin into the body does not generally cause death").
In People v. Cruciani, 70 Misc.2d 528, 334 N.Y.S.2d 515
(1972), the defendant administered an injection of heroin to the victim who was under the influence of barbituates. As a result, the victim died of an overdose of heroin. The defendant was indicted for manslaughter and criminally negligent homicide. In Cruciani, the court, in determining whether the indictments against the defendant should be dismissed, also pondered the questions as to whether the defendant's conduct constituted a substantial and unjustifiable risk of death and whether the risk was a gross deviation from the standard of conduct that a reasonable person would observe in the situation. In its opinion, the court stated:
 " 'What amounts to a violation of this section [the criminally negligent homicide statute] depends, of course, entirely on the circumstances of the particular conduct. Whether in those circumstances the act or acts causing death involved a substantial and unjustifiable risk, and whether the failure to perceive it was such as to constitute a gross deviation from the standard of care which a reasonable man would have observed under the same circumstances, are questions that generally must be left directly to the trier of facts.' . . . 'While it is difficult to clarify further these questions [citations omitted], it would seem sufficiently clear that for proper determination of these questions, two main considerations should be emphasized. Firstly, criminal liability cannot be predicated upon every careless act merely because its carelessness results in another's death; and, secondly, the elements of the crime "preclude the proper condemnation of inadvertent risk creation unless 'the significance of the circumstances of fact would be apparent to one who shares the community's general sense of right and wrong.'"'"
Cruciani, 334 N.Y.S.2d at 522. (Emphasis in original.)
We hold that the jury in the case at bar properly could have and did find that the appellant's failure to perceive the risk he created was a gross deviation from the standard of care that a reasonable man would observe under the circumstances. The evidence in this case was sufficient to support the appellant's conviction for criminally negligent homicide. *Page 812 
 II
The appellant contends that the State also failed to prove that his conduct was the cause-in-fact of the appellant's death. Citing Lewis v. State, 474 So.2d 766 (Ala.Crim.App. 1985), he argues that since the victim voluntarily and knowingly drank the morphine, the victim's conduct was a superseding and intervening cause sufficient to break the chain of causation.
The facts of Lewis are clearly distinguishable from the case at bar. In Lewis, the victim and the defendant had "played" Russian roulette at the defendant's house on the day in question. After the "game" was over, the defendant put the gun away and went into another room and made a telephone call. During this time, the victim found the gun and shot himself.
This court in Lewis held that the victim "exercised his own free will when he got the gun, loaded it and shot himself," and thus, "the victim's conduct was a supervening, intervening cause sufficient to break the chain of causation." Lewis, 474 So.2d at 771. We also stated that:
 If the victim had shot himself while he and the appellant were playing Russian Roulette, or if the appellant was present when the victim was playing the game by himself, the appellant's conduct of influencing the victim to play would have been the cause-in-fact and the proximate cause of the victim's death. . . . .
 "It also seems clear that the appellant would be responsible for the victim's death if he had left the room while the victim was still playing the game because he should have perceived the result. But, the evidence reveals that the appellant had put the gun away after they finished playing the 'game.'"
Lewis, 474 So.2d at 771.
In the case at bar, the State's evidence showed that it was the appellant who supplied the morphine to the victim. When the whiskey ran out that night, it was the appellant who told the group that he knew where he could obtain some morphine. The appellant and the victim then went to the appellant's house and got the morphine, which had been prescribed for the appellant's father who was dying of cancer. The two returned to Davis's apartment. The appellant then mixed the morphine and some Sprite in a glass and brought the glass into the living room. The appellant then allowed the victim to drink from the glass.
Section 13A-2-5(a), Code of Alabama 1975, provides that "[a] person is criminally liable if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was sufficient to produce the result and the conduct of the actor clearly insufficient."
 "If the actual result is not within the contemplation of the actor, or within the area of risk which he should have been aware, he is not deemed to have 'caused' the result. But if the difference is only one concerning which person or what property would be affected by defendant's act, or one of the degree of harm which would result, he is still held to have 'caused' the result." Commentary, Ala. Code, § 13A-2-5 (1975).
In Lewis, we found that the victim's conduct was a superseding, intervening cause because we did not believe that the appellant should have perceived that the victim would go get the gun and shoot himself with it after the gun had been put away. Here, the appellant made the morphine available to the victim and was present when the victim drank the morphine mixture. The victim's conduct in voluntarily drinking the morphine was a concurrent cause rather than a superseding, intervening cause. See State v. Thomas, 118 N.J. Super. 377,288 A.2d 32 (1972). See generally Ramirez, Homicide Liabilityfor the Furnishing of Dangerous Narcotics, 6 St. Louis Pub.L.Rev. 161 (1987). The fact that the appellant only believed the victim would get "high" by drinking the morphine does not change the result.
The appellant also contends that his act of furnishing morphine to the victim was not the cause-in-fact of the victim's death because there was testimony that the victim died as a result of a morphine and Secobarbitol overdose. However, there *Page 813 
was also evidence that the amount of morphine alone, could or would have been sufficient to cause the victim's death. Thus, we find that the State sufficiently proved the causal relationship between the appellant's conduct and the victim's death.
 III
The appellant asserts that the trial judge erred by refusing to give his written requested charges # 4 and # 12. The appellant's charge # 12 reads as follows:
 "I charge you, members of the jury, that a determination as to whether the conduct of a person caused the suicide of another must necessarily include an examination of the victim's free will. The free will of the victim is seen as an intervening cause which breaks the chain of causation." (R. 40.) (Emphasis added.)
Black's Law Dictionary 1286 (5th ed. 1979) defines suicide as "[s]elf destruction; the deliberate termination of one's existence." There is absolutely no evidence that the victim's death in this case was a suicide. Thus, the trial judge properly refused the above-quoted charge which was requested by the appellant.
The appellant also claims that the trial judge improperly refused to give his requested charge # 4. This charge contained more than one principle of law and was abstract. The charge did not provide any instructions as to the effect of these legal principles upon the issues in this case. "Requested instructions which are mere statements of legal principles, without instruction as to the effect upon or application to the issues are abstract and may properly be refused. This is true even where a correct principle of law is set out." Wyrick v.State, 409 So.2d 969 (Ala.Crim.App. 1981), cert. denied, (Ala. 1982). Thus, the trial judge properly refused the appellant's requested charge # 4.
 IV
The appellant contends that there was a fatal variance between the indictment in this case and the proof at trial. The indictment in the case at bar states that the appellant "did recklessly cause the death of Michael Shane Nelson, by making available to him liquid morphine and thereby cause[d] the death of Michael Shane Nelson, in violation of § 13A-6-3, Code of Alabama." (R. 5.) The appellant argues that a variance existed because the evidence at trial showed that the victim died as a result of a morphine and Secobarbitol overdose.
 " 'An indictment must apprise the accused with reasonable certainty of the nature of the accusation against him so that he may prepare his defense and plead the judgment of conviction as a bar to any subsequent prosecution for the same offense.' [Citations omitted.] An accused is constitutionally guaranteed sufficient notice of the charges against him. Such notice is mandatory in order to insure that an accused may properly defend himself at trial on a crime for which he has been indicted. [Citation omitted.] Proof of the same crime under some other set of facts or proof of some other crime is insufficient. The accused cannot be deprived of the notice that he is constitutionally guaranteed. [Citations omitted.]
 "A variance in the indictment and the proof will be deemed fatal when it affects the substantial rights of the accused. [Citations omitted.] A variance between the indictment and the proof is not necessarily fatal. [Citations omitted.] A material variance exists when the variance misleads the accused or substantially impairs him in making his defense. [Citations omitted.] However, as this court has ruled many times, a variance will not be deemed to be material when the evidence indicates that the accused committed a substantial offense contained in the indictment."
Griffin v. State, 500 So.2d 83, 85-86 (Ala.Crim.App.), cert.denied, (Ala. 1986).
We find that a variance between the indictment and the proof at trial did, in fact, exist in this case. The indictment alleged that the victim died as a result of the appellant's making morphine available to him, and there was evidence at trial that *Page 814 
the victim died of a combination of morphine and Secobarbitol overdose. However, we hold that the variance in this case did not affect the substantial rights of this appellant. During the court's oral charge to the jury, the court stated:
 "I charge you, ladies and gentlemen of the jury, that there has been evidence presented at trial by the State of Alabama relating to the drug Seconal or Secobarbital and its effect upon the decease[d] Michael Shane Nelson.
 "I further instruct you that you may not infer any guilt whatsoever on the Defendant regarding any alleged possession, furnishing, or making available the drug Seconal or Secobarbital. Am I pronouncing that right?
"MR. RAMEY: Yes, sir.
 "THE COURT: The Defendant has not been charged with allegedly making any drug available to the decease[d] other than morphine." (R. 227-28.)
Thus, in light of the court's instructions to the jury to disregard any evidence concerning the Secobarbitol and the fact that there was evidence that the victim's ingestion of morphine alone could have caused the victim's death, we find that the variance here was not fatal. See United States v. Gaultier,727 F.2d 711 (8th Cir. 1984); Flowers v. State, 441 So.2d 1053
(Ala.Crim.App. 1983).
 V
The appellant contends that his one-year sentence constituted cruel and unusual punishment. The appellant was convicted of criminally negligent homicide, which is a Class A misdemeanor. The term of imprisonment for a Class A misdemeanor is for "not more than one year." Ala. Code, § 13A-5-7 (1975). The appellant's sentence did not exceed the statutorily prescribed limits, and thus, this court is without authority to review the sentence set by the trial judge. Porter v. State, 520 So.2d 235
(Ala.Crim.App. 1987); Lyle v. State, 497 So.2d 834
(Ala.Crim.App. 1986).
The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur.