## Brown v. Commonwealth.

(Decided February 11, 1927.)

## Appeal from Pulaski Circuit Court.

1. Homicide.—Court properly submitted to jury charge of involuntary manslaughter by carelessly administering morphine, despite lack of direct evidence of quantity administered.

2. Homicide.—Evidence held to sustain conviction of involuntary manslaughter by carelessly administering morphine, despite lack of direct evidence of quantity administered.

3. Criminal Law.—In prosecution for involuntary manslaughter by administration of morphine, instruction assuming that defendant did not know, or have reason to know, that the quantity administered was dangerous to life, being in favor of defendant, held not ground for complaint by him.

4. Criminal Law.—Statements of defendant, charged with involuntary manslaughter by carelessly administering morphine, that he had given decedent a couple of shots of morphine, but that was not what was the matter with him, held not a confession, but merely an admission of the truth of an independent or isolated fact which might tend to prove guilt, and not to require an instruction, under Criminal Code of Practice, section 240, providing that confession out of court will not alone warrant conviction.

5. Homicide.—"Involuntary manslaughter" consists in doing some unlawful act which results in the death of another without purpose to kill him, or such killing while doing a lawful thing in and unlawful or careless manner.

B. J. BETHURUM for appellant.

FRANK E. DAUGHERTY, Attorney General, and JOHN P. CUSICK for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Affirming.

Appellant, being indicted charged with the murder of Henry Hines, was convicted of involuntary manslaughter, and appeals.

The evidence not authorizing it, the trial court declined to instruct on murder, but submitted the case to the jury under instructions for voluntary and involuntary manslaughter.

Appellant and decedent were very intimate friends, and had been for some years. One of them was 25 and the other 23 years of age, and they worked together in the railroad machine shops at Somerset. Out of working

hours they spent much of their time together, both in the daytime and at night.

One day in March, 1925, they got together about two o'clock in the afternoon, and with a young lady companion went in a machine some miles in the country on a fishing expedition. They returned late in the afternoon and arranged to go that evening to an informal dance and take the same young lady, which they did. But the party appears to have been prematurely broken up by the return unexpectedly of the lady of the house where it was in progress, she having been absent theretofore. The decedent appears to have taken some whiskey to the party, and while there was drinking.

After the party appellant and decedent remained together for some hours, and during that period they were each drinking, decedent being very much intoxicated, and appellant not so much so. About eleven o'clock or later they appeared at a restaurant, and soon after they arrived there decedent said "he was in his dope, that he had had two shots and was just right." Decedent thereafter sat down at a table or in a compartment of the restaurant, and some time later those present observed, as they thought, that he had fallen asleep, but when they undertook to arouse him they were unable to do so, and he was evidently then in a state of coma. Those present, including appellant, became uneasy about his condition, and decedent was placed in appellant's machine, and by appellant driven to a hospital, where he was informed that the doctor in charge was at his home; he then drove to the doctor's home and leaving decedent in the machine went to the doctor's house and told him there was a man in his machine who was very ill or very drunk, whereupon the doctor told him to take the drunken man on home, he could do nothing for him. Appellant claims that decedent then told him he did not want to go home but wanted to go with him, and that then he took decedent to a garage near his (appellant's) home, and leaving him there went immediately to decedent's home and notified his family of his condition; that decedent's brother then proceeded with appellant back to the garage, and soon after they reached there another machine passed by, and at the suggestion of the brother, decedent was placed in that machine and taken home, and thereafter appellant also went to that home.

It was probably between twelve and one o'clock when decedent reached his home and he was immediately undressed and placed in bed, and between that and three, or shortly thereafter when he died, three doctors were called, none of whom were able to do anything for him, and he never regained consciousness.

The indictment charges appellant with the murder of decedent "by giving and administering and causing to be given and administered to the said Henry Hines large and fatal doses and quantities of morphine, cocaine and other dangerous, poisonous and narcotic drugs," and appellant was found guilty under the involuntary manslaughter instruction upon the theory that he had, without intention to do so, carelessly administered to decedent such quantities of morphine as resulted in his death.

The evidence that decedent died of morphine poisoning consists of his statement above quoted in the restaurant, and the evidence of the three doctors who visited him at his home that night, each of them stating that he was suffering from and died from narcotic poisoning, and each of them gave convincing reasons for that opinion. On the other hand the evidence that appellant had administered the morphine to decedent consists of his admission, said to have been made to decedent's brother the night of his death, as the two went from his father's home back to the garage where appellant had left him. The brother states that as they went to the garage appellant had in his possession a hypodermic syringe with a needle in it, and said that he had given to decedent a couple of shots of morphine, but insisted that was not what was the matter with him; that appellant was pretty full at the time and talked all the time, and said he did not want his brother's trouble laid upon him, and repeated that the morphine was not what was the matter with him. In addition to this another witness states that the day before this occurrence appellant had had in his possession such a hypodermic syringe.

Although appellant strenuously denied all these things in his evidence, it seems clear that it, taken in connection with the evidence of the doctors that decedent had died that night of narcotic poisoning, justified the submission of that issue to the jury.

There was no direct evidence of the quantity of morphine administered by appellant to decedent in either of

the doses, and it is therefore urged by appellant's counsel that as the evidence failed to show the administration of such doses as would probably result in his death, he was entitled to a directed verdict.

In the light of the evidence, however, that he was suffering from and died from morphine poisoning, and there being no evidence that he had taken any morphine except that administered by appellant, the jury was authorized to fairly draw the conclusion that the doses so administered by appellant were of such size and quantity as to bring about his death, and the jury in the instruction was only authorized to find appellant guilty if they should believe that the quantity so administered by him caused, contributed to or hastened the death of Hines. The evidence of the doctors that decedent was suffering from and died from morphine poisoning, and the evidence that appellant had administered to him a few hours before his death, upon two occasions, some quantity of morphine, authorized the court to submit the question in the form it did, and justified the jury in returning the verdict it did.

Nor is the criticism that the instruction assumed essential facts to exist justified; the only thing assumed in the instruction, which there was no direct evidence about, was that appellant administered the same to decedent without knowing or having reason to know that the quantity so administered was dangerous to life, and clearly that assumption was for the benefit of the defendant on trial, and is something of which he can not complain.

But it is said the court erred in failing to give an instruction under the provisions of section 240 of the Criminal Code. That section provides that a confession of a defendant, unless made in open court, will not warrant a conviction unless accompanied by other proof that such an offense was committed.

That contention here grows out of the statements testified to by decedent's brother as to the administration of the two doses of morphine. The statement as testified to, however, is in no sense a confession, for the evidence of the witness distinctly says that appellant at the same time insisted that the morphine so administered by him had nothing to do with decedent's condition. In other words, appellant's statement, instead of being a confes-

sion, was merely an admission of a fact which he protested had not brought about the decedent's condition.

The admission by one of the truth of independent or isolated facts which may tend to prove his guilt is not equivalent to a confession, and does not authorize an instruction under section 240. Bates v. Com., 164 Ky. 1; Spicer v. Com., 21 R. 528.

Involuntary manslaughter consists in doing some unlawful act which results in the death of another without purpose to kill him, or such killing of another while doing a lawful thing in an unlawful or careless manner. Conner v. Com., 13 Bush 714; Roberson's Criminal Law, section 198.

Appellant's offense comes within the meaning of these definitions; he was unlawfully in possession of a prohibited product, and he was unlawfully undertaking to administer a dangerous narcotic to another. But if he had been lawfully in possession of the morphine and had been authorized to administer it, yet the evidence tends to show he was careless in the quantity he administered.

While it would be more satisfactory if the quantity administered had been shown, and that quantity had been shown sufficient to result in death, yet under the facts disclosed the jury was authorized only to convict if they believed the quantity administered either caused, contributed to or hastened the death of Hines.

Judgment affirmed.