**Franklin Dean POWELL, II, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2003–SC–0266–DG.

Supreme Court of Kentucky.

April 20, 2006.

Thomas M. Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Tami Allen Stetler, Assistant Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

COOPER, Justice.

A Daviess Circuit Court jury convicted Appellant, Franklin Dean Powell, II, of reckless homicide, KRS 507.050, traffick-

ing in methamphetamine, KRS 218A.1435,[1] and tampering with physical evidence, KRS 524.100. He was sentenced to two years in prison for the homicide conviction, five years for the trafficking conviction, and one year for the tampering conviction, all to run consecutively for a total of eight years in prison. The only issue raised by this appeal is whether the trial court erred by not directing a verdict of acquittal on the charge of reckless homicide. For the reasons explained herein, we affirm.

The standard for reviewing the sufficiency of the evidence in a criminal case was succinctly stated in *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991):

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving for the jury questions as to the credibility and weight to be given to such testimony.

*Id.* at 187, 816 S.W.2d 186.

Billie Jolene Bennett, age 21, died at Owensboro Mercy Health Center at 10:00 a.m. on October 30, 1999. Dr. Donna Hunsaker, the pathologist who performed the postmortem examination, testified that the cause of Bennett's death was methamphetamine intoxication. Mike Ward, the toxicologist who tested Bennett's blood sample, testified that the methamphetamine level in Bennett's blood was three milligrams per liter, which he described as a "lethal level." According to Dr. Hunsaker, methamphetamine will stay in a person's system and remain effective for six to fifteen hours after ingestion. If taken intravenously, the maximum concentration can occur within a few hours. One side effect can be a heartbeat so rapid as to lead to arrhythmia. The postmortem examination also revealed damage to Bennett's heart muscle.

Appellant and Bennett were together, either alone or with mutual friends at the residence of Appellant's girlfriend, Holly Mourning, for most of the twenty-four hours immediately preceding Bennett's death. Appellant gave two statements to the police on October 30, 1999, both of which were read to the jury at trial. He also testified at length in his own behalf. Following the dictates of *Benham*, we consider his statements and testimony and the inferences to be drawn from them in the light most favorable to the Commonwealth.

Appellant admitted that Bennett did not ingest any methamphetamine in his presence until approximately 3:30 a.m. on October 30th, when the two were parked alone in his vehicle near a vacant field on the outskirts of Owensboro. Bennett had left Mourning's residence on two occasions earlier that evening for periods of approximately one hour each. Appellant speculated that Bennett visited her boyfriend, David Crowell, during those absences and that Crowell may have injected her with methamphetamine during those visits. Crowell, however, denied injecting Bennett with methamphetamine that night.

Sometime after midnight, Bennett complained that she was not feeling well, so Appellant drove her to a convenience store, ostensibly to purchase a carbonated beverage. Instead, Appellant purchased a bottle of water. Appellant had three packages of methamphetamine stored under the console inside his vehicle. He admit-

---

1. *Repealed by* 2000 Ky. Acts, ch. 169, § 2    (current version at KRS 218A.1412).

ted that he owned the methamphetamine contained in those packages. After driving to the vacant field, Appellant got out of the vehicle to get some fresh air. When he reentered the vehicle, he saw that Bennett had mixed some of his methamphetamine with the water he had purchased at the convenience store and had placed it in a hypodermic syringe preparatory to injecting it into her left arm. Upon inserting the needle into her arm, Bennett complained of a burning sensation. Appellant interpreted that complaint as evidence that Bennett had not inserted the needle into a vein but had simply inserted it under her skin. Appellant knew that if methamphetamine is injected subcutaneously instead of intravenously, "the effect is not like it normally is." Perceiving that Bennett was insufficiently skilled to accomplish an intravenous injection, Appellant "did her a favor" by guiding the needle to a vein on the inside of Bennett's left elbow and pushing the syringe's plunger, thereby injecting the methamphetamine directly into the vein. Shortly thereafter, Appellant and Bennett engaged in sexual intercourse, following which Appellant fell asleep.

When Appellant awoke several hours later, Bennett "didn't look right." She asked him to take her to Crowell's residence. Appellant parked near Crowell's residence and went to sleep, thinking Bennett would go inside the residence. When he awoke about an hour later, Bennett was still seated beside him. He spoke to her, but she did not respond. He touched her arm, but again she did not respond. Appellant then went to Crowell's residence and spent approximately thirty minutes trying to arouse Crowell. Finally, Crowell came out, saw that Bennett was barely breathing, and returned to his residence and telephoned the "911" emergency services operator. The call was received at 8:45 a.m. Appellant removed the remaining methamphetamine and syringes from his vehicle and hid them under a shed in Crowell's back yard. He and Crowell then attempted to perform cardiopulmonary resuscitation (CPR) on Bennett. The emergency medical team arrived at 8:49 a.m. and removed Bennett to the hospital, where she was pronounced dead at 10:00 a.m. When Holly Mourning subsequently asked Appellant why he had not taken Bennett to the hospital,[2] Appellant replied that he had seen Bennett that sick once before and she had "pulled through it," so he thought she would pull through it again this time. From that testimony, the jury could reasonably infer that Appellant knew that Bennett had previously had a severe adverse reaction to the ingestion of methamphetamine.

Appellant claimed that the quantity of methamphetamine that he injected into Bennett's vein was a less-than-normal amount and not enough to account for the level of methamphetamine subsequently found in her blood. He speculated that Bennett might have self-injected additional methamphetamine after he fell asleep. However, he did not testify that the quantum of methamphetamine hidden under the console in his vehicle had been further depleted; and, although Dr. Hunsaker testified that she found five needle marks on the inside of Bennett's right elbow and two more on the inside of her left elbow, her microscopic examination revealed that only one needle mark on the left elbow appeared to be a fresh wound. Although Dr.

---

2. There was no evidence that Bennett would have survived if she had reached the hospital sooner. Nor did the indictment or the trial court's instructions purport to premise Appel-

lant's criminal liability on the failure to seek medical treatment. *See Westrup v. Commonwealth*, 123 Ky. 95, 93 S.W. 646 (1906).

Hunsaker did not know if the methamphetamine injected by Appellant caused Bennett's death, she testified that "[i]f that was the only exposure she had within the half-life [six to fifteen hours prior to death], then that was the true cause of that methamphetamine level," *i.e.*, three milligrams per liter of Bennett's blood.

Appellant was convicted of reckless homicide, *i.e.*, causing Bennett's death while acting recklessly. KRS 507.050. The penal code defines "recklessly" as follows:

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

KRS 501.020(4). The penal code addresses the issue of causation in the context of an unintentional homicide as follows:

> When wantonly or recklessly causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware . . . .

KRS 501.060(3). As noted in the plurality opinion in *Lofthouse v. Commonwealth*, 13 S.W.3d 236 (Ky.2000), the latter provision was adopted from section 2.03 of the Model Penal Code, and "the plain intent of the statute is to have the causation issue framed in all situations in terms of whether or not the result as it occurred was either foreseen or foreseeable by the defendant as a reasonable probability." 13 S.W.3d at 239 (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 2–4(d)(3), at 74 (1998)). Thus, to convict Appellant of reckless homicide, the Commonwealth was required to prove that (1) the intravenous injection of methamphetamine administered by Appellant caused Bennett's death; (2) there was a substantial and unjustifiable risk that Bennett would die as a result of the injection; and (3) the risk of Bennett's death was of such nature and degree that Appellant's failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would observe in the situation, *i.e.*, that Bennett's death was foreseeable as a reasonable probability. *Id.* at 241.

In *Lofthouse*, there was no question that the cocaine and heroin that the defendant gave to the victim caused the victim's death, whereas Appellant claims here that the amount of methamphetamine he injected into Bennett's vein was insufficient to cause her death. Nevertheless, Appellant admitted injecting methamphetamine into Bennett's vein and there was no evidence that Bennett ingested any other quantity of methamphetamine during the six to fifteen hours prior to her death. Further, Bennett began acting strangely within a few hours of the injection, consistent with Dr. Hunsaker's testimony that the maximum concentration of methamphetamine in the blood can occur within a few hours if taken intravenously. The jury was entitled to disbelieve Appellant's testimony as to the amount of methamphetamine that he injected into Bennett's vein.

In the pre-penal code case of *Brown v. Commonwealth*, 219 Ky. 406, 293 S.W. 975 (1927), the defendant was convicted of involuntary manslaughter on the basis of (1) medical evidence that the victim died of morphine poisoning; (2) testimony that the victim had stated "that he was in his dope; that he had had two shots and was just right;" and (3) testimony of the victim's

brother that the defendant showed him a hypodermic syringe and needle and told him that he had given the victim two shots of morphine. *Id.*, 293 S.W. at 976. On appeal, the defendant claimed he was entitled to a directed verdict of acquittal because there was no evidence of the quantity of morphine administered to the victim or that the administration of the two doses would probably cause death. In affirming the conviction, our predecessor court held that "there being no evidence that [the victim] had taken any morphine except that administered by appellant, the jury was authorized to fairly draw the conclusion that the doses so administered by appellant were of such size and quantity as to bring about his death." *Id.*, 293 S.W. at 977. *See also Commonwealth v. Vaughn,* 43 Mass.App.Ct. 818, 687 N.E.2d 270, 272–73 (1997) (conviction of involuntary manslaughter [defined as unlawful homicide unintentionally caused by wanton or reckless conduct] affirmed where defendant admitted injecting victim with heroin but claimed that he only injected a one-half dose which he did not believe would be fatal because he had shared heroin with the victim in the past). We conclude that the evidence was sufficient for a reasonable jury to believe beyond a reasonable doubt that the methamphetamine that Appellant injected into Bennett's vein caused her death.

The evidence of risk and foreseeability presented in this case clearly distinguishes it from *Lofthouse.* In *Lofthouse,* the Commonwealth proved only that the defendant shared his cocaine and heroin with the victim and that ingestion of those drugs caused the victim's death. The defendant did not administer the drugs to the victim and, in fact, ingested the same quantities of the same drugs as did the victim without even losing consciousness. There was no evidence that the victim had suffered any prior adverse reactions from ingesting drugs or that the defendant knew of any such instances. *Lofthouse,* 13 S.W.3d at 241–42.

> [T]he Commonwealth needed to prove not only the toxic qualities of cocaine and heroin, but also that a layperson, such as Appellant, should reasonably have known that there was a substantial risk that the amount of cocaine and heroin ingested by Buford would result in his death. That is especially true where, as here, Appellant did not directly cause the victim's death, but only furnished the means by which the victim caused his own death.

*Id.* at 241.

In addition to proving the toxic qualities of methamphetamine and that the victim died of methamphetamine intoxication, the Commonwealth introduced evidence here that (1) both the methamphetamine and the water used to dissolve it into liquid form suitable for injection belonged to Appellant; (2) Appellant actually injected the methamphetamine into Bennett's vein— knowing that the effect would be "different" than if only injected subcutaneously as Bennett, herself, had done; (3) Appellant knew Bennett had suffered a severe adverse reaction from ingesting methamphetamine on a previous occasion though she "had pulled through it;" and (4) the amount of methamphetamine found in Bennett's blood during the postmortem examination was sufficient to be "lethal."

In *People v. Cruciani,* 70 Misc.2d 528, 334 N.Y.S.2d 515 (N.Y.Co.Ct.1972), the defendant claimed that upon observing the victim unsuccessfully attempting to inject heroin into her own arm, he assisted her in doing so and, in fact, injected the fatal dose of heroin into her arm. *Id.* at 517. In overruling the defendant's pre-trial motions to dismiss, the county court distinguished *People v. Pinckney,* 38 A.D.2d 217,

328 N.Y.S.2d 550 (N.Y.App.Div.1972), which had held that the mere sale of heroin by the defendant to the victim who died after self-injecting it into his own body was insufficient to sustain a homicide conviction, and held that the jury could consider the following factors in determining whether the defendant was aware of and disregarded a substantial risk that death would result from the injection (equivalent to our offense of manslaughter in the second degree), or whether he failed to perceive a substantial and unjustifiable risk that death would result and that the failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would observe under the circumstances (equivalent to our offense of reckless homicide):

(1) Was the injection intravenous or subcutaneous?

(2) Was the deceased "high" on barbiturates at the time the defendant injected her with heroin?

(3) Did defendant know, or should [he] have known, under the circumstances, that the deceased was "high" on barbiturates at the time of injecting her with heroin?

(4) Did the defendant supply the deceased with the heroin or the implements to administer the heroin?

(5) Did defendant know, or should he have known, under the circumstances, the quantity or quality of heroin he was injecting into deceased's body?

(6) Did the defendant know, or should he have known, under the circumstances, whether the deceased had developed a tolerance for heroin?

(7) Did the defendant know, or should he have known, under the circumstances, whether the quantity he injected was the deceased's regular dosage?

*Cruciani,* 334 N.Y.S.2d at 520–23. The defendant's subsequent conviction of manslaughter in the second degree was affirmed by New York's highest court in *People v. Cruciani,* 36 N.Y.2d 304, 367 N.Y.S.2d 758, 327 N.E.2d 803 (1975).

While the facts of our case are somewhat different, it was for the jury to determine whether Appellant injected a larger amount of methamphetamine into Bennett's vein consistent with the amount found during the postmortem examination, perhaps intending to induce sufficient intoxication to erode any resistance by Bennett to his subsequent sexual advances; that he did so knowing that an intravenous injection would cause greater intoxication than the subcutaneous injection Bennett allegedly administered to herself; and that he did so knowing that Bennett had previously suffered a severe adverse reaction to methamphetamine, making it reasonably foreseeable that an intravenous injection of a substantial amount of methamphetamine on this occasion would cause a similar reaction from which she might not "pull through." A reasonable jury could well conclude beyond a reasonable doubt that Appellant's failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would observe in the situation. KRS 501.020(4).

Accordingly, the judgment of convictions and the sentences imposed by the Daviess Circuit Court are affirmed.

LAMBERT, C.J.; GRAVES, SCOTT, and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., dissents by separate opinion, with ROACH, J., joining that dissent.

JOHNSTONE, Dissenting Justice.

Because I believe that the elements of reckless homicide were not established in this case, I must dissent.

As noted by the majority, a person acts recklessly with respect to a result or to a circumstance when he or she "fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists." KRS 501.020(4). The majority opinion further acknowledges that the element of recklessness is "not established if the actual result is not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware ...." KRS 501.060(3). Thus, to support a conviction for reckless homicide in this case, the jury was required to believe that Appellant acted recklessly in failing to perceive the risk of Ms. Bennett's death when he injected her with methamphetamine.

At trial, the defense questioned the Daviess County deputy coroner concerning the risk of overdose by methamphetamine. The deputy coroner testified that Daviess County had been compiling statistics on cases of methamphetamine overdoses since 1986, thirteen years prior to Ms. Bennett's death. In those thirteen years, there had been a *single* case of death by methamphetamine overdose in Daviess County. Moreover, Appellant himself testified that he had never seen anyone overdose on methamphetamine before Ms. Bennett.

Because no evidence was presented that the risk of death by methamphetamine overdose is substantial or unjustifiable, I believe that Appellant was entitled to a directed verdict. A "substantial" risk is one that is significant, ample, considerable, and real. The sole testimony at trial concerning this risk indicated that the occurrence of deadly methamphetamine overdose is actually an exceedingly rare occurrence. While the jury could believe that death by methamphetamine overdose is possible based on this testimony, there was no evidence presented that the risk of such death was "substantial." It defies any sense of logic to charge Appellant with reckless behavior based on his failure to perceive a risk that is, in reality, marginal.

ROACH, J., joins.