# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: AUGUST 27, 2009
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2007-SC-000194-MR

FINAL

DATE 11/25/09 Kelly Klaber DC.

CHARLOTTE HALL                                             APPELLANT

V.

ON APPEAL FROM WOLFE CIRCUIT COURT
HONORABLE FRANK A. FLETCHER, JUDGE
NO. 05-CR-00075

COMMONWEALTH OF KENTUCKY                          APPELLEE

## MEMORANDUM OPINION OF THE COURT

## REVERSING AND REMANDING

On May 6, 2006, thirteen-year-old Dylan McIntosh died as a result of acute methadone intoxication. Following a jury trial in January 2007, Dylan's mother, Charlotte Hall, was found guilty of murdering her son by wantonly permitting him to ingest the drug. Hall appeals as a matter of right from the March 9, 2007 Judgment of the Wolfe Circuit Court incorporating that verdict and sentencing her, in accord with the jury's recommendation, to thirty years and one day in prison. Hall contends that the trial court erred (1) by denying her motion for a directed verdict; (2) by permitting the introduction of hearsay statements by her co-defendants; (3) by permitting the introduction of prior bad acts evidence; (4) by refusing to instruct the jury on facilitation of wanton murder; (5) by refusing to strike a juror for cause; and (6) by coercing the jury to reach a sentencing recommendation. We agree with Hall that the evidence

did not support a finding of murder and so must reverse the trial court's judgment and remand for additional proceedings.

**RELEVANT FACTS**

Hall did not testify at trial, but the jury heard an audio recording of her interview with Detective Tim Gibbs of the Kentucky State Police. Hall told Detective Gibbs that on May 5, 2006, she and Dylan had accepted the invitation of a friend, Jamie Watson, to spend the night at the Campton, Kentucky, residence Watson shared with another of Hall's friends, Jim Land. According to Hall, Dylan, who suffered from attention deficit hyperactive disorder (ADHD), was "hyper" when they reached the Watson/Land residence, and because she was out of the medicine—Depakote—prescribed for his condition, she gave him one of her Klonopin tranquilizers instead. She later learned that Watson had also given Dylan a Klonopin.

That night, according to Hall, the three adults engaged in heavy drug use. Land had recently filled his prescription for methadone, a synthetic narcotic, and all three adults ingested methadone intravenously and by "snorting" it. They also ingested other prescription drugs. Hall stated that at some point during the evening Watson had crushed one of Land's methadone pills into a powder, had divided the powder into four "lines," and that she, Hall, had acquiesced in Land's and Watson's giving one of the "lines" to Dylan. She claimed that she did not actually see Dylan ingest the methadone, because he carried it into another room, but she admitted that she had given him a fifty-dollar bill to roll into a straw for the purpose of "snorting" the methadone

2

powder. She also stated that at some other point during the night Dylan told her that Watson had given him a "bunch" of methadone pills, and that rather than taking the pills away from him she had said, "Dylan, you don't need the god-damned methadones. Put the sons-of-bitches up. You've got school tomorrow. We're supposed to be straightening up."

According to Hall's statement, Dylan went to sleep at about 11:00 p.m., and at about 6:00 or 6:30 a.m., she tried to rouse him for school, but he was snoring deeply and would not be roused. She fell back to sleep, and at about 10:00 a.m., when she next awoke, Dylan's lips had turned blue. She tried throwing water in his face, shaking him, "blowing in his mouth," and "pounding on his chest," but she could not awaken him.

Soon thereafter Land's mother, who lived nearby, came to the door with a neighbor looking for Land. She testified that upon seeing Dylan's lack of color she called for emergency assistance. Dylan was pronounced dead at the Appalachian Regional Hospital in West Liberty, Kentucky. Post-mortem analysis indicated a blood-methadone level of 0.25 milligrams per liter, and the medical examiner determined that Dylan died from acute methadone intoxication.

Hall, Land, and Watson were all indicted in conjunction with the death. Hall was tried separately. Although the Commonwealth presented additional evidence confirming the presence of methadone in the Land/Watson residence, confirming the fact that the three adults had ingested methadone and other drugs, and confirming Dylan's death prior to or soon after his arrival at the

3

hospital, Hall's statement and the post-mortem examiner's testimony assigning the cause of death were the crux of the Commonwealth's case. Hall contends that that evidence was insufficient to support a finding of wanton murder. We agree.

## ANALYSIS

### I. The Commonwealth's Proof Did Not Support A Finding Of Wanton Murder, But Did Support A Finding Of Reckless Homicide.

As the Commonwealth correctly notes,

> [o]n motion for a directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

Commonwealth v. Benham, 816 S.W.2d 186, 187 (Ky. 1991) (citation omitted).

A directed verdict, moreover, should be granted only

> when the defendant is entitled to a complete acquittal[,] *i.e.*, when, looking at the evidence as a whole, it would be clearly unreasonable for a jury to find the defendant guilty, *under any possible theory*, of any of the crimes charged in the indictment or of any lesser included offenses.

Campbell v. Commonwealth, 564 S.W.2d 528 (Ky. 1978). *Accord,* Nichols v. Commonwealth, 142 S.W.3d 683 (Ky. 2004). In cases where there may be

4

insufficient evidence to satisfy the burden of proof on a primary offense, but there is sufficient evidence to satisfy the burden of proof on a lesser-included offense, the issue regarding the insufficiency of the evidence is preserved by making a timely objection to the jury instruction on the unproved offense. Campbell v. Commonwealth, supra; Kimbrough v. Commonwealth, 550 S.W.2d 525 (Ky. 1977). In this case, Hall moved for a directed verdict of acquittal, but she did not object on sufficiency grounds to the jury instruction charging her with wanton murder or to either of the instructions charging her with the lesser-included offenses of second-degree manslaughter or reckless homicide. Her directed verdict motion was properly denied, therefore, if the evidence was sufficient to support the least of these offenses, that of reckless homicide.

Reckless homicide is defined in KRS 507.050, which provides that

> A person is guilty of reckless homicide when, with recklessness he causes the death of another person.

"Recklessness" is defined in KRS 501.020(4):

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

As we noted in Lofthouse v. Commonwealth, 13 S.W.3d 236 (Ky. 2000), another case in which the defendant was charged with reckless homicide for having supplied a fatal overdose of illicit drugs,

> [w]hen wantonly or recklessly causing a particular result is an element of an offense, the element is not

5

established if the actual result is not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware.

*Id.* at 239 (quoting KRS 501.060(3)).

In Lofthouse, the defendant shared his supply of cocaine and heroin with the decedent. The defendant had used similar amounts of cocaine and heroin previously without critical consequences, and he had previously observed the decedent use similar amounts of cocaine. We reversed the defendant's reckless homicide conviction because, although the Commonwealth had proved the toxic qualities of the drugs involved and had proved that the amounts of the drugs found in the decedent's body could be fatal, it had failed to prove that

a layperson, such as Appellant, should reasonably have known that there was a substantial risk that the amount of cocaine and heroin ingested by [the decedent] would result in his death.

*Id.* at 241. It was not enough, we held, for the Commonwealth to prove merely "that the dosages were fatal to [the decedent]." *Id.* at 242.

In Powell v. Commonwealth, 189 S.W.3d 535 (Ky. 2006), on the other hand, a methamphetamine overdose case, we upheld a reckless homicide conviction where the drug supplier, knowing that the victim had recently suffered an adverse reaction to methamphetamine from which she had barely "pulled through," administered intravenously what the post-mortem examiner characterized as a lethally large dose of that drug. A jury could properly conclude, we held, that a reasonable person in those circumstances would have realized that methamphetamine in the amount the defendant injected into the victim posed a substantial risk of killing her.

6

This case lies somewhere between <u>Lofthouse</u> and <u>Powell</u>. Unlike <u>Lofthouse</u>, in which an adult voluntarily ingested a quantity of illicit drugs that killed him, this case involves the provision of potentially dangerous drugs to a child. Unlike <u>Powell</u>, on the other hand, there was no medical testimony or other evidence estimating or characterizing the amount of methadone Dylan ingested, nor was there evidence that Hall was on notice of Dylan's particular reaction to methadone.

A conviction of reckless homicide in this case required proof beyond a reasonable doubt that Dylan's ingestion of methadone caused his death; that there was a substantial and unjustifiable risk that Dylan would die if he ingested the methadone which the adults furnished him; and that the risk of Dylan's death was of such a nature and degree that Hall's failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would observe in the circumstances, *i.e.,* that Dylan's death was foreseeable as a reasonable probability. KRS 507.050; KRS 501.020(4). In <u>Lofthouse</u> we rejected the Commonwealth's argument that schedule I and schedule II controlled substances are inherently dangerous and always pose a risk of death. As noted above, we held instead that beyond the drugs themselves, proof of risk and foreseeability are required:

> the Commonwealth needed to prove not only the toxic qualities of cocaine and heroin, but also that a layperson, such as Appellant, should reasonably have known that there was a substantial risk that the amount of cocaine and heroin ingested by [the decedent] would result in his death.

7

13 S.W.3d at 241. Much as in Lofthouse, beyond the drug itself, there was simply no proof in this case tending to establish either the magnitude or the foreseeability of the risk. There was no evidence, for example, that Dylan, because of his youth or some other reason, may have been unusually susceptible to methadone poisoning, nor was there evidence that the amount of the drug he ingested posed a substantial risk of poisoning. In the case of a child as young as this, however, we are unwilling to adhere mechanically to the proof requirements of Lofthouse. We are convinced, rather, given the universal recognition that children are more susceptible to the hazards of illicit drugs than are adults and given our law's overriding policy of protecting children from those hazards[1] that a reasonable jury could find, beyond a reasonable doubt, that providing a thirteen-year-old child with a "bunch" of ten milligram methadone pills, particularly knowing that the child had already ingested two Klonopins and a fourth of a methadone pill, posed a substantial risk of death, and that Hall grossly deviated from a reasonable standard of care by failing to perceive this risk and acting to avert it. Because the evidence thus justified a finding of reckless homicide, the trial court did not err when it denied Hall's motion for a directed verdict.

This conclusion does not end the analysis, however. Hall's contention on appeal is that the evidence did not support her conviction for wanton murder. As noted above, Hall failed to preserve this issue by timely objecting to the

---

[1] *See for example* KRS 218A.1401, enhancing the penalty for drug trafficking when drugs are transferred to a minor, and KRS 530.064, making it an offense to involve a minor in illegal controlled substances activity.

wanton murder instruction, but she seeks review of the unpreserved error under the palpable error standard of RCr 10.26. Pursuant to that rule, an unpreserved error may be deemed palpable only if it is indeed palpable, *i.e.,* clear from the record, and only if it affects the defendant's substantial rights and has resulted in manifest injustice, *i.e.,* "the required showing is probability of a different result [absent the error] or error so fundamental as to threaten a defendant's entitlement to due process of law." Martin v. Commonwealth, 207 S.W.3d 1, 3 (Ky. 2006).

Wanton murder, of course, is a more culpable offense than reckless homicide with correspondingly greater proof requirements. Hall's conviction of wanton murder required proof beyond a reasonable doubt that there was a grave risk that Dylan would die if he ingested the methadone his adult caretakers furnished him, and that Hall knew of but consciously disregarded that risk under circumstances manifesting extreme indifference to human life. KRS 507.020; KRS 501.020(3). As noted above, however, the Commonwealth failed to adduce evidence tending to establish the degree of risk the methadone posed in this case, as required by Lofthouse, and we decline to presume, even in the case of a child, that it posed a grave risk of death.

Hall's statement, moreover, does not indicate that she recognized but disregarded such a risk. Although, as the Commonwealth notes, Hall did state that she accepted Watson's invitation to spend the night "against my better judgment," that statement hardly amounts to evidence that she perceived a grave risk of death. On the contrary, Hall apparently did not anticipate that

9

Dylan would ingest more than the "line" of methadone, and the only concern reflected in Hall's statement about his ingesting an additional amount was that it would render him unfit for school the next day. While it is appalling, of course, that a parent would allow her child to ingest methadone, the murder statute, KRS 507.020, applies to parents no differently than to anyone else. The proof that statute requires was not presented in this case, and no rational juror could have found otherwise. Accordingly, we agree with Hall that the trial court erred by instructing the jury on wanton murder.

Was the error palpable? We are convinced that it was, for both Powell and Lofthouse were controlling law by the time of Hall's January 2007 trial, and those cases should have made it clear that the Commonwealth had fallen well short of its burden of proving a grave risk that Hall consciously disregarded. Hall's murder conviction was, thus, manifestly unjust and implicates her fundamental right to due process. Miller v. Commonwealth, 77 S.W.3d 566 (Ky. 2002) (noting that the Commonwealth's burden of proof is grounded in the Due Process Clause).

Hoping to avoid this result, the Commonwealth argues that even if Hall could not be found aggravatedly wanton for acquiescing in Dylan's use of methadone, she could still be found aggravatedly wanton for failing to take more appropriate steps to save him once she realized that he was in acute distress. Hall was charged, however, with causing Dylan's death "by permitting him to obtain controlled substances and by permitting him to use controlled substances," not by failing to rescue him. Obviously, the charge may not be

10

expanded on appeal, and in any event there was no proof that prompter emergency treatment would have made a difference.

Because we are reversing Hall's murder conviction for lack of evidence, the reversal is in effect an acquittal on the murder charge. Under the state and federal double jeopardy clauses, therefore, Hall may not be retried for murder. McGinnis v. Wine, 959 S.W.2d 437 (Ky. 1998). As noted, however, Hall was also charged with the lesser-included offenses of second-degree manslaughter and reckless homicide. Where a conviction is reversed for insufficient evidence, the defendant may be retried on a lesser-included offense provided that at the first trial there was an instruction on the lesser offense and further provided that the evidence at the first trial was sufficient to support a conviction for that offense. Combs v. Commonwealth, 198 S.W.3d 574 (Ky. 2006); Ex parte Granger, 850 S.W.2d 513 (Tex. Crim. App. 1993); Beverly v. Jones, 854 F.2d 412 (11th Cir. 1988). In discussing the sufficiency of the evidence, we have already determined that a reckless homicide instruction was justified, and so Hall may be retried for that offense. It remains to consider whether she may also be retried for second-degree manslaughter.

To support the second-degree manslaughter instruction, the evidence at the first trial had to justify a finding that Hall wantonly caused Dylan's death. KRS 507.040. A person acts wantonly with respect to a result or a circumstance described by a statute defining an offense

> when he is aware of and consciously disregards a
> substantial and unjustifiable risk that the result will
> occur or that the circumstance exists. The risk must
> be of such nature and degree that disregard thereof

11

> constitutes a gross deviation from the standard of
> conduct that a reasonable person would observe in the
> situation.

KRS 501.020(3). As discussed above, although the Commonwealth failed to present evidence tending to establish the magnitude of the risk posed by the methadone Dylan ingested, a reasonable person would have recognized that supplying a thirteen-year-old child with two Klonopin pills and a "bunch" of ten milligram methadone pills posed a substantial and unjustifiable risk of death. There was no evidence, however, either direct or circumstantial, that Hall perceived that risk and consciously disregarded it. The evidence indicates only that she perceived a risk that Dylan would not be awake in time for school in the morning. Although her unreasonable failure to perceive the more serious risk subjects Hall to a reckless homicide prosecution, it is not enough to support a finding of second-degree manslaughter. This result may seem insufficient given the tragic consequences of Hall's conduct, but as Lofthouse and Powell make clear, it is the result dictated by the Penal Code's homicide scheme. Accordingly, retrial of the alleged second-degree manslaughter offense is also barred on remand.

## II. Hall Did Not Establish That The Recording Of Her Interview With The Investigating Detective Should Have Been Redacted.

### A. The Trial Court Did Not Err By Refusing To Redact Statements The Detective Attributed To Hall's Co-Defendants.

Having determined that Hall's murder conviction must be reversed and the case remanded, we address Hall's other allegations of error only to the extent that they raise issues apt to bear on a new trial. Hall contends that the

12

trial court erred by failing to require that certain portions of her interview with Detective Gibbs be redacted. During the interview, the Detective challenged Hall's statements several times by confronting her with contrary statements Land and Watson had purportedly given him. For example, Hall initially told the Detective that Land had given her one of his methadone pills. The Detective then asked, "Are you sure? He told me you bought it off him." Hall then corrected herself, admitted that she had purchased a pill for $6, and claimed that she crushed the pill and intravenously ingested a portion of it. Watson, she stated, had crushed another pill and had divided it into the "lines," one of which Dylan ingested. The Detective said, "According to Jim, okay, according to Jim's statement that he gave me, you bought a methadone, you all split it up, did four lines off of it. And that you all four did a line, Dylan included." Hall insisted that Watson had prepared the "lines" from a second pill, and when she further insisted that she only reluctantly acquiesced in Watson and Land's giving one of the "lines" to Dylan, the Detective responded with, "But Jim says you gave him permission." Hall contends that these and several other references to statements Watson and Land purportedly made to the Detective amounted to testimonial hearsay and so, because she did not have an opportunity to cross-examine Watson and Land, that they violated her confrontation right under the Sixth Amendment to the United States Constitution as recently interpreted by the United States Supreme Court in

13

Crawford v. Washington, 541 U.S. 36 (2004) and Davis v. Washington, 547 U.S. 813 (2006).[2] We disagree.

As Hall correctly notes, in Crawford and Davis the Supreme Court held that the Confrontation Clause bars the admission into evidence of testimonial hearsay "unless [the declarant] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Davis v. Washington, 547 U.S. at 813 (quoting from Crawford v. Washington, supra). The bar applies regardless of whether the evidence would otherwise be admissible pursuant to an exception to the hearsay rule. In Davis, the Court noted that statements made in the course of police interrogation

> are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 813. There is little doubt that the statements attributed to Land and Watson satisfy that portion of the Crawford rule.

The Commonwealth contends, however, that the statements are not hearsay, and thus do not implicate the Confrontation Clause, because they were not introduced for their truth but rather to supply context for Hall's statements. The Commonwealth notes that police interrogators frequently confront suspects with supposed statements by victims, witnesses, or co-

---

[2] Hall also cites Bruton v. United States, 391 U.S. 123 (1968), in support of her Confrontation Clause claim. Bruton, however, addresses the slightly, but significantly, different situation where a non-testifying co-defendant's extra-judicial statement is being introduced against the co-defendant, not, as here, against a defendant being tried separately. See Lee v. Illinois, 476 U.S. 530 (1986). Crawford and Davis are the cases applicable to Hall's situation.

14

defendants, and that the point of these challenges is not the truth of the supposed statement, which may indeed be a fabrication, but rather the response elicited from the suspect. Because the Detective's purported quotes were not introduced for the truth of what Land and Watson purportedly said, but rather to provide context for Hall's statements and admissions, the Commonwealth maintains that permitting the jury to hear the unredacted interview did not violate Crawford and Davis. We agree.

Although this is an issue of first impression in Kentucky, we recently addressed a very similar issue in Turner v. Commonwealth, 248 S.W.3d 543 (Ky. 2008). Turner involved a tape-recorded transaction between a confidential informant and the defendant, an alleged seller of illegal drugs. In addition to incriminating statements by the defendant, the recording included statements by the informant, who did not appear at trial. The defendant argued that because she was not able to cross-examine the informant, the admission of the unredacted recording into evidence violated her confrontation rights under Crawford and Davis. We held that to the extent the informant's recorded statements provided context for those of the defendant, they served a valid, non-hearsay purpose and so did not implicate or run afoul of the Confrontation Clause.

We agree with the Commonwealth that in this case, too, the Detective's portion of Hall's interrogation, including the few statements he attributed to Land and Watson, provides necessary context for Hall's statements. The Detective's references to things Land and Watson purportedly said was a valid

15

interrogation technique, *cf.* Lanham v. Commonwealth, 171 S.W.3d 14 (Ky. 2005) (noting that officers may confront a suspect with their belief that he has not been truthful), and the references were not used at trial for the truth of the purported statements, but only to show why and how Hall's statement evolved as it did. As in Turner, this was a valid, non-hearsay use of the purported Land and Watson statements, and thus their inclusion in the evidence did not constitute a Crawford error. This precise issue has not yet found its way into many published opinions, but the little authority we have found from other jurisdictions is in accord. State v. Roque, 141 P.3d 368 (Ariz. 2006); Woods v. Wolfe, 2008 WL 2371401 (S.D. Ohio 2008); State v. Mannion, 637 A.2d 452 (Me. 1994). *See also* Commonwealth v. Pelletier, 879 N.E.2d 125 (Mass. App. 2008) (noting the widespread agreement among both federal and state courts that the non-hearsay use of testimonial statements does not violate Crawford). We caution, however, that trial courts must review the challenged interrogation to ascertain that the statements from other witnesses are limited and were a logical part of the interrogation. Police questioning cannot be used to "back door" statements that are otherwise inadmissible. An interrogation laced with constant references to other witnesses' statements would not be entitled to the "appropriate interrogation technique" deference.

Hall did not request a jury admonition to the effect that the Land and Watson statements were being presented not as proof that what the co-defendants purportedly said was true, but just to explain the context of the conversation between Detective Gibbs and Hall. We agree with the suggestions

16

in <u>State v. Roque</u>, <u>supra</u>, and <u>Woods v. Wolfe</u>, <u>supra</u>, however, that such an admonition is appropriate, and if requested at retrial one should be provided. *Cf.* <u>Lanham v. Commonwealth</u>, <u>supra</u> (recommending admonition in a similar context).

## B. References In Hall's Statement To Her Prior Incarceration And To A Prior Bad Act Did Not Amount To Palpable Error.

Hall also contends that several references in her statement to the fact that she had recently spent thirteen days in jail should have been redacted as well as references to an episode two weeks prior to Dylan's death when he was removed from school for being under the influence of alcohol. These references, she maintains, constitute evidence of a prior crime and a prior bad act which were not admissible under KRE 404(b) since they were not relevant to any contested issue. With the exception of one of the jail references, which was redacted, Hall concedes that this issue was not preserved by an appropriate objection prior to or during trial. She nevertheless requests review under the palpable error standard discussed above, *i.e.*, a clear error on the face of the record which probably bore on the result or which was so fundamental as to threaten the defendant's right to due process. <u>Martin v. Commonwealth</u>, <u>supra</u>. The alleged error here, however, does not meet this standard. Even if the references should have been redacted (which we do not decide) the unredacted statement did not deprive Hall of a fundamentally fair trial, and there is no reasonable possibility, much less a probability, that excluding the challenged references from Hall's statement would have altered the result. Hall's statement would still have included, after all, her admission

17

that she permitted Dylan to ingest methadone and to have in his possession additional methadone pills. We decline to address the unpreserved error, therefore, but that does not preclude Hall from seeking redaction of the jail and drinking episode references on remand.

### III. The Trial Court Did Not Err By Refusing To Instruct On Criminal Facilitation.

Hall next contends that the trial court erred when it refused to instruct the jury on facilitation of the primary and lesser-included offenses. She notes the general rule that the court should instruct on the whole law of the case, Gabow v. Commonwealth, 34 S.W.3d 63 (Ky. 2000), and argues that a rational juror could have believed that Land and Watson committed the principal offense by supplying Dylan with the methadone intending or knowing that he would use it, and that she, Hall, did no more than facilitate the principal offense by "standing by and allowing it to happen."

Criminal facilitation is defined in KRS 506.080:

> A person is guilty of criminal facilitation when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.

Facilitation is distinguished from complicity, its close cousin, by the different mental states they involve. Complicity requires a *mens rea* as culpable as that required for conviction of the principal offense, Tharp v. Commonwealth, 40 S.W.3d 356 (Ky. 2000). Facilitation, on the other hand, may be found only where the defendant, knowing that a crime was afoot or was intended, aided

18

the principal actor but nevertheless was "wholly indifferent to the actual completion of the crime." Commonwealth v. Nourse, 177 S.W.3d 691, 700 (Ky. 2005) (citing Perdue v. Commonwealth, 916 S.W.2d 148 (Ky. 1995) (internal quotation marks omitted). A facilitation instruction is not appropriate unless the evidence supports such a finding of knowing but disinterested aid. Monroe v. Commonwealth, 244 S.W.3d 69 (Ky. 2008).

The trial court denied Hall's request for facilitation instructions because it believed that her active participation in the drug abuse that went on at the Hall/Watson residence precluded a finding that she was "wholly indifferent" to whether Dylan became involved. We agree. Indeed, Hall admits in her statement that she encouraged Dylan's participation not only by her example, but by giving him a fifty-dollar bill to fashion into a "snorting" straw. This fact belies her claim that she "stood by and did nothing" while Land and Watson gave drugs to her son. No rational juror could have found otherwise. The trial court, accordingly, did not err by refusing to instruct on facilitation.

**IV. Alleged Errors Not Apt To Bear On A Retrial Are Not To Be Reviewed.**

Finally, Hall contends that the trial court erred by refusing to strike a juror for cause and by pressuring the jury to reach a sentencing decision. Because these issues are not apt to recur at a retrial, we need not address them here. Bell v. Commonwealth, 245 S.W.3d 738 (Ky. 2008).

## CONCLUSION

In sum, we agree with Hall that the Commonwealth failed to prove that she wantonly murdered her son. The state proved that Hall participated in

19

supplying her son with methadone and that methadone killed him, but it failed to prove the wanton murder elements that Hall was aware of but disregarded a grave risk that the amount of methadone Dylan was taking was apt to prove fatal. Absent this proof, Hall's murder conviction must be reversed. On remand, Hall may be retried for the lesser offense of reckless homicide. At a retrial, Hall's interview with Detective Gibbs may be introduced without redacting the statements the Detective attributed to Hall's co-defendants, but upon Hall's request the jury should be admonished to consider those statements not for their truth but only as part of the interview's context. Accordingly, we reverse the March 9, 2007 Judgment of the Wolfe Circuit Court and remand for further proceedings consistent with this opinion.

All sitting. Minton, C.J.; Abramson, Cunningham, Noble, Schroder, and Venters, JJ., concur. Scott, J., dissents.

SCOTT, JUSTICE, DISSENTING: I must respectfully dissent from my esteemed colleagues' reversal of Appellant's wanton murder conviction as it ignores the abundant circumstantial evidence in this disturbing case—a mother involving her 13-year-old son in a deadly drug binge. It is well settled that circumstantial evidence alone is sufficient for a criminal conviction "as long as the evidence taken as a whole shows that it was *not clearly unreasonable* for the jury to find guilt." Lawson v. Commonwealth, 53 S.W.3d 534, 548 (Ky. 2001) (emphasis added); see also Schrimsher v. Commonwealth, 190 S.W.3d 318, 328 (Ky. 2006); Bray v. Commonwealth, 177 S.W.3d 741, 748 (Ky. 2005). Plainly, a parent has an inescapable legal duty to protect their

20

child from physical injury. <u>Lane v. Commonwealth</u>, 956 S.W.2d 874, 875-76 (Ky. 1997). Here, the jury found sufficient circumstantial evidence to find Appellant guilty beyond a reasonable doubt of murder under circumstances rising to the level of wantonness and in my opinion the verdict was *clearly not unreasonable.*

## I. THE COMMONWEALTH'S PROOF SUPPORTED A CONVICTION OF WANTON MURDER

When a defendant participates in a felony, "dangerousness with respect to the underlying felony can be derived either from the nature of the felony *or the method of its perpetration or attempted perpetration.*" <u>Graves v. Commonwealth</u>, 17 S.W.3d 858, 863 (Ky. 2000). Thus, the circumstances surrounding a felony crime can be so dangerous as to satisfy the element of aggravated wantonness necessary for a conviction of wanton murder. <u>Id.</u> We can even disregard the accused's lack of awareness of the grave risk and the foreseeability of harm created by his conduct, as we did in drunk driving cases like <u>Hamilton v. Commonwealth</u>, 560 S.W.2d 539 (Ky. 1977).

As Professor Abramson observes with respect to this Court's holding in <u>Hamilton</u>, wantonness "applied regardless of whether the defendant was either too drunk to realize the seriousness of the risk of driving while intoxicated at the time his conduct caused a result, or too absent-minded or feeble-minded. The risk which the defendant consciously disregarded occurred when he started to drive under the influence." Leslie W. Abramson, 10 <u>Kentucky Practice, Substantive Criminal Law</u>, § 3:5 (2nd ed. 2000). Here, it started when she took her minor son to the drug party.

21

It is common knowledge that a child's body is more physically vulnerable to drugs than an adult's, evidenced generally by the heightened regulation of controlled substances with regards to children (e.g. differing dosage requirements for children and adults and restrictions or prohibitions of certain powerful substances for children). We also know that children lack the emotional maturity and deliberative reasoning skills that are formed by the life experience of adults. Children, therefore, are more likely to be be unaware of or consciously disregard the potential dangers of drug abuse—e.g. the potential deadliness posed by even a single drug, the deadly interactions between multiple drugs, the potential allergic reactions, the effect of drugs on known or unknown pre-existing medical conditions, etc. These considerations would be racing through the mind of any reasonable parent who knows that his or her child is in a situation involving drug abuse. This is why the Appellant's dereliction of her legal duty to protect her child is so damning in this instance. Not only did she disregard the risks that drugs pose to children, but she approved of her son's use.

While it is true that Lofthouse v. Commonwealth, 13 S.W.3d 236 (Ky. 2000) requires the Commonwealth to adduce evidence tending to establish the degree of risk a drug posed to the victim, such evidence was presented here. Kentucky's Associate Chief Medical Examiner testified that an overdose of Methadone is deadly and that "a person who takes too much of it . . . goes to sleep, their breathing gets shallower, then they finally stop breathing and die." TR at 440. Given the evidence, the jury obviously concluded that this wasn't

22

the Appellant's first go-round with drugs—that she knew of their potential effect. Regardless, <u>Lofthouse</u> is distinguishable as involving an adult victim, whereas, here, Dylan was an adolescent weighing 92 pounds. A juror could reasonably infer from the evidence that Methadone was lethal to Dylan in even smaller doses than would kill an adult.

Plainly, I believe that sufficient evidence was presented to show that Appellant knowingly brought her 13-year-old son to a drug binge; that she gave her minor son drugs; that, instead of executing her legal duties as a parent, she became intoxicated with Marijuana, Oxycontin, and Methadone; that she assented to and gave her minor son the instruments for ingesting crushed Methadone with the adults; that she did not remove additional Methadone from her minor son's possession; and that she went back to sleep when presented with evidence that her minor son was in a drug induced sleep from which he would not wake. When viewed within the context of parental common sense concerning the vulnerability of children to drug abuse, there was sufficient evidence of wantonness for the jury to reasonably find Appellant guilty of wanton murder.

I, therefore, respectfully dissent, and would affirm this conviction.

23

COUNSEL FOR APPELLANT:

Shannon Dupree
Department of Public Advocacy
Assistant Public Advocacy
Suite 301, 100 Fair Oaks Lane
Frankfort, KY 40601


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

Heather M. Fryman
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, KY 40601-8204